UNITED STATES of America, Appellee,

v.

Anthony TAVOULARIS et al., Appellants.

Nos. 911, 913, 934, Docket 75–1027, 75–1028, 75–1032.

United States Court of Appeals, Second Circuit.

Argued April 18, 1975.

Decided May 6, 1975.

---

Joel A. Brenner, McCarthy, Dorfman & Brenner, Mineola, N. Y., Gustave H. Newman, New York City, of counsel, for appellant Tavoularis.

Stanley M. Meyer, Martin Light, Brooklyn, N. Y., of counsel, for appellant Poerio.

Sheila Ginsberg, William J. Gallagher, The Legal Aid Society, Federal Defender Services Unit, New York City, for appellant Daniels:

Alan J. Sobol, Atty., Dept. of Justice, Washington, D. C. (David G. Trager, U. S. Atty., E. D. N. Y., of counsel), for appellee.

Before KAUFMAN, Chief Judge, and LUMBARD and SMITH, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

In October, 1969, personnel in the Custody Department of the Morgan Guaranty Trust Company of New York discovered that some $13,194,000 worth of United States Treasury bills had disappeared, presumably subsequent to their purchase by the bank's Bond Department but prior to their deposit in the vault. On March 4, 1970, government agents arrested Anthony Tavoularis, Joseph DiRienzo and Stuart Norman as

they left Frank's Luncheonette on East New York Avenue in Brooklyn; stuffed inside Norman's shirt were nine Treasury bills with an aggregate face value of $2,600,000, subsequently identified by their serial numbers as among the bills missing from the Morgan bank. Tavoularis, Vincent Poerio and Louis Daniels were indicted[1] by a grand jury in the United States District Court for the Eastern District of New York, and, after a jury trial before Judge Thomas C. Platt, were convicted of conspiracy to possess and possession of the bills, knowing them to have been stolen from a bank, in violation of 18 U.S.C. §§ 371[2] and 2113(c).[3] This appeal is primarily concerned with who knew what about how the bills got from the Morgan bank into Norman's shirt. We hold that the government failed to prove that these defendants knew enough to satisfy the knowledge requirement of § 2113(c), and accordingly we reverse the judgments of conviction and remand to the district court with directions to dismiss the indictment.

---

**1.** An earlier indictment had named Tavoularis and Norman as defendants. Norman entered a guilty plea; Tavoularis went to trial but a hung jury resulted in a mistrial. The instant indictment, filed on March 6, 1974, named Norman, DiRienzo and one Melvin Berman as unindicted co-conspirators. The case went to trial on October 24, but on October 29 a mistrial was declared on account of the deaths of Tavoularis' father and the father of one of the jurors. A new jury was empaneled and the trial began afresh on November 4. This trial resulted in the verdicts of guilty and judgments of conviction now appealed from.

**2.** § 371. Conspiracy to commit offense or to defraud United States

   If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

   \*   \*   \*   \*   \*   \*

**3.** § 2113. Bank robbery and incidental crimes

   \*   \*   \*   \*   \*   \*

   (c) Whoever receives, possesses, conceals, stores, barters, sells, or disposes of, any

## I. THE FACTS

The evidence, viewed in the light most favorable to the government, established, as the government accurately portrays it, a "thieves' market" in stolen bills. In late 1969, Daniels, manager of the Williams Bar on Fort Hamilton Parkway in Brooklyn, asked Norman, who had a vending machine business, if he knew where to get rid of stolen securities. Norman said no, but not long thereafter Melvin Berman, who worked in another bar and was in debt to Norman, asked Norman if he knew of "a good shot at maybe making some money." Tr. 594.[4] Recalling Daniels' offer, Norman took Berman to Daniels' apartment. While Berman waited downstairs, Norman asked Daniels if the securities were still available. Daniels made a telephone call and reported that $3 million worth would be available, and that they were Treasury notes rather than securities.[5] Norman reported this to Berman, who asked for a sample. Thus, at a later date the two returned to Daniels' apartment. Again Berman waited down-

---

property or money or other thing of value knowing the same to have been taken from a bank, credit union, or a savings and loan association, in violation of subsection (b) of this section shall be subject to the punishment provided by said subsection (b) for the taker.

   \*   \*   \*   \*   \*   \*

   The relevant portion of subsection (b) provides:

   (b) Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $100 belonging to, or in the care, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined not more than $5,000 or imprisoned not more than ten years, or both;

   \*   \*   \*   \*   \*   \*

**4.** References to the trial transcript are designated "Tr."

**5.** Of course, they were in fact Treasury bills rather than notes. And, while Treasury bills and notes can be considered securities, Daniels apparently thought that there was some distinction of significance.

stairs. This time, Poerio was with Daniels, and Norman told him that Berman was the one who would be getting rid of the bills. Poerio went downstairs and told Berman that only $2.7 million would be available. An arrangement was made for Berman to receive a sample. Late in February, 1970, Norman met Poerio and Daniels in a bar; Poerio gave Norman a sample bill, and Norman took it to Berman's apartment. After he got there, Tavoularis arrived and conferred with Berman. Norman left the sample bill with them that night. The next day, he and Berman went to a house and picked up the sample, and Norman returned it to Daniels.

In the meantime, Tavoularis had approached DiRienzo and asked if he could get rid of some Treasury bills. DiRienzo said that a fence in Cedarhurst named Murray might be interested. DiRienzo had never met Murray and, although he did not contact him regarding Tavoularis' proposal, he told Tavoularis that Murray would pay eleven to twelve points (that is, eleven to twelve per cent of face value), but wanted to see a copy of the bills.[6] DiRienzo and Tavoularis went to an apartment in Howard Beach with the name "Berman" on the outside; Tavoularis went in and returned with the sample, giving it to DiRienzo who was supposed to take it to Murray in Cedarhurst. Instead, DiRienzo took it home and copied the serial number. He subsequently returned it to Tavoularis, advising him that Murray would pay twelve points if the bills were delivered by noon on Tuesday, March 3. On Monday, March 2, DiRienzo called federal authorities, who commenced surveillance.

On Tuesday, DiRienzo, Tavoularis and one Arnie went to Berman's apartment to pick up the bills. They were unavailable. DiRienzo complained, and Tavoularis assured him that he would have the bills the next day. That evening, however, Norman picked up the package of bills from Poerio and Daniels in a bar on Cross Bay Boulevard, went to Berman's and counted them, and then proceeded to Tom's Bar in East New York for a meeting with Tavoularis and DiRienzo, hoping to make the transfer to DiRienzo's buyer that night. But DiRienzo, taken by surprise, was unable to reach the Secret Service, and told Norman and Tavoularis that Murray couldn't make it that night. Norman returned to Poerio and Daniels at the Cross Bay Boulevard bar to report; Poerio made a telephone call to find out if he could hold the bills until the next morning. He was given the green light, and it was agreed that Norman would meet Daniels and Poerio in the morning in a diner on Atlantic Avenue.

At 8:00 a. m. the next day, Wednesday, March 4, the three met. Daniels and Poerio gave the package of bills to Norman, who went to Frank's Luncheonette to meet Tavoularis and DiRienzo, carrying the package inside his shirt. At the luncheonette, Norman and DiRienzo went into the bathroom while Tavoularis stood outside. DiRienzo examined the bills and returned them to Norman, who put them back in his shirt. All three then left the luncheonette; as they approached Tavoularis' car, ostensibly to go to Cedarhurst to see Murray, DiRienzo gave a pre-arranged signal and they were all arrested.

The government's case thus presented a picture of an ever-lengthening chain of middlemen looking for a buyer. The chain started with the unexplained disappearance of the bills from the Morgan bank. There is no evidence whatever that any of the defendants took part in what was apparently an inside job, nor is there any indication of how many links removed from the bank the defendants were. The government's evidence loses sight of the chain after the bills' disappearance from the Morgan bank and

6. The use of the word "copy" rather than "sample," Tr. 202, might indicate that DiRienzo thought the bills were counterfeit rather than stolen. This might also explain why, when DiRienzo called the FBI on March 2, 1970, he was referred to the Secret Service: He may have said that a scheme to unload counterfeit bills was afoot.

picks it up with Poerio. He apparently was closer in line to the thief than the other defendants because he made contact with a prior possessor of the bills on the evening of Tuesday, March 3, to see if he could keep them until the next day. Daniels, apparently, was the next link; he was closest to Poerio. The search for a buyer then went from Daniels to Norman to Berman to Tavoularis to DiRienzo, and ended when DiRienzo, instead of going to Murray in Cedarhurst, went to the authorities.

## II. SUFFICIENCY OF THE EVIDENCE

The construction of 18 U.S.C. § 2113(c) is not seriously in issue here.[7] It is clearly an essential element of a crime under that statute that the defendant had knowledge that the property he possessed was stolen *from a bank.* The question, rather, is whether there was sufficient evidence in this case for the jury to find the requisite knowledge beyond a reasonable doubt.

■ As a preliminary matter, we dispose of a point not specifically mentioned by the government here, but on which the district court relied in denying defendants' motions to dismiss the indictment at the conclusion of the government's case. The district court apparently held that, if any one defendant had the requisite knowledge, it could be imputed to the other defendants for purposes of the conspiracy count. Tr. 679–80. This is an erroneous statement of legal principle. Where a substantive offense requires specific knowledge, that same knowledge must be established before a defendant can be found to be a member of a conspiracy to commit that offense. United States v. Hysohion, 448 F.2d 343, 347 (2d Cir. 1971). This applies equally to an aider and abettor[8] as to a conspirator, and the requisite knowledge cannot be imputed from one aider and abettor or conspirator to another. United States v. Steward, 451 F.2d 1203, 1207 (2d Cir. 1971).[9] Therefore, if there was insufficient evidence of knowledge on the substantive count, the conviction on the conspiracy count is equally defective.

■■ It is undisputed that, while the evidence tending to prove that the defendants knew the bills were *stolen* was overwhelming, there was no direct evidence that they knew they were stolen *from a bank.* However, placing primary reliance on Crone v. United States, 411 F.2d 251 (5th Cir.), cert. denied, 396 U.S. 896, 90 S.Ct. 195, 24 L.Ed.2d 173 (1969), the government contends, and the district court held, that such knowledge may be inferred from the unexplained possession of property recently stolen from the bank. In *Crone,* the court adopted a theory of multiple inferences, holding that unexplained possession of recently stolen goods gives rise to an inference of knowledge that the goods were stolen and also to an inference of participation in the theft, and that one who participated in the theft *ipso facto* has knowledge of where the goods were stolen from. 411 F.2d at 254. We have no occasion here to decide whether, in the abstract, the inference of participa-

---

7. Defendants do make an argument that there can be no violation of § 2113(c), which requires knowledge that property was taken in violation of § 2113(b), unless the evidence shows that there was a larcenous taking of property rather than an embezzlement, since only a larcenous taking constitutes a violation of § 2113(b). However, in United States v. Fistel, 460 F.2d 157, 162–63 (2d Cir. 1972), this court squarely held that § 2113(b) covers embezzlement, and defendants offer no persuasive reason for abandoning that holding.

8. The defendants here were charged with aiding and abetting on the substantive count.

9. As the Supreme Court recently noted in United States v. Feola, —— U.S. ——, ——, 95 S.Ct. 1255, 1265, 43 L.Ed.2d 541 (1975):

> Our decisions establish that in order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself.

The Court went on to hold that *greater* knowledge would not be required for a conspiracy conviction than for the underlying substantive offense.

tion in the theft from unexplained possession of recently stolen goods comports with due process requirements,[10] *compare*, United States v. Jones, 418 F.2d 818 (8th Cir. 1969) (inference disapproved), *with* McAbee v. United States, 434 F.2d 361 (9th Cir. 1970) (inference approved), since here, in light of the other evidence in the case, an inference of participation in the theft would verge on the irrational.[11]

Of the three defendants, Poerio apparently was the closest link to whoever took the bills from the Morgan bank; it is clear, however, that there was at least one link between Poerio and the bank since Poerio had to call an unidentified person for permission to hold the bills overnight from March 3 to March 4. And given the nature of the "thieves' market" depicted by the government it would be the sheerest of speculation to

say that Poerio's contact was the thief. If the evidence rebuts any inference that Poerio participated in the theft, it necessarily defeats that inference with respect to Daniels and Tavoularis as well, for they were both further down the chain. Moreover, Daniels' statement to Norman after a phone call to someone—perhaps Poerio—that the bills were still available, and that they were Treasury notes and not securities, is a clear indication that he was nothing more than a middleman; a participant in the theft would most likely have known what was stolen. As for Tavoularis, the evidence seems clear that he had no part in the operation until recruited by Berman. To infer participation in the theft would thus be irrational here with respect to each defendant, since that inference is totally inconsistent with the evidence adduced by the government. *Crone*, therefore is inapplicable.[12]

**10.** An inference relied on to establish an element of a crime will be rejected as violative of due process "unless it can at least be said with substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend." Leary v. United States, 395 U.S. 6, 36, 89 S.Ct. 1532, 1548, 23 L.Ed.2d 57 (1969) (footnote omitted). Whether the inference must also satisfy the "beyond a reasonable doubt" test of In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), is a question yet to be decided. Barnes v. United States, 412 U.S. 837, 841–46, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973); Turner v. United States, 396 U.S. 398, 416, 419, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970); Leary v. United States, *supra*, 395 U.S. at 36 n. 64, 89 S.Ct. 1532. It should be noted that in *Barnes supra*, the Court held that an instruction that the jury could infer that the defendant knew that certain goods were stolen from the fact of his unexplained possession of the goods while they were recently stolen meets the "beyond a reasonable doubt" test. *Barnes* is of little value to the government here since under § 2113(c) knowledge that the property was stolen from a bank is required, whereas in *Barnes* the government only had to prove that defendant knew the property was stolen.

**11.** Since we hold that the inference here did not satisfy the less stringent "more likely than not" test, we need not reach the question reserved in *Barnes, Turner* and *Leary* of whether such inferences must also meet the "beyond a reasonable doubt" test. *See*, note 10, *supra*. We do note, however, that at least three mem-

bers of the Court have expressly stated that they would require the stricter standard. Cupp v. Naughten, 414 U.S. 141, 154, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973) (dissenting opinion of Brennan, J., with whom Douglas and Marshall, JJ., concurred); Barnes v. United States, *supra*, 412 U.S. at 852–54, 93 S.Ct. 2357 (dissenting opinion of Brennan, J., with whom Marshall, J., concurred). It may well be that a factor relevant to the determination of that issue in any particular case would be whether, on the one hand, the inference was the *only* evidence tending to prove an essential element of the crime, or the jury was told that the inference *alone* was sufficient to establish such an element, or, on the other hand, the inference was but *one bit of circumstantial evidence among many*.

We realize that the application of *Leary/Turner/Barnes* analysis to this common-law inference is contrary to this court's statement in United States v. Coppola, 424 F.2d 991, 993 (2d Cir.), cert. denied, 399 U.S. 928, 90 S.Ct. 2246, 26 L.Ed.2d 795 (1970), that such analysis is applicable only to statutory presumptions and not to common-law inferences. That proposition was rejected in *Barnes, supra*, 412 U.S. at 844–45 & n. 8, 93 S.Ct. 2357, however, and we are obliged to give *Barnes* controlling effect.

**12.** Also inapplicable are other cases cited by the government to support its contention that the requisite knowledge may be inferred from the fact of possession.

In United States v. Fistel, 460 F.2d 157 (2d Cir. 1972), the defendant, charged with a viola-

Admittedly there was no direct evidence of the requisite knowledge, and we have held that such knowledge could not be inferred from the possession of the recently stolen bills. The question remains whether there was any other evidence sufficient to permit the jury to find beyond a reasonable doubt that the defendants knew that the bills were stolen from a bank. We conclude that there was not. The serial numbers were not sequential and there was nothing on the face of the bills to indicate their source,[13] there is no evidence that any of the defendants were acquainted with the thieves,[14] nor can it be inferred from any statements of the defendants that they had been advised of the theft by the robber.[15] The most substantial argument in support of a finding that there was sufficient evidence of knowledge might be the claim that stolen Treasury bills are necessarily, almost as a matter of definition, Treasury bills that have

been stolen from a bank. If we could accept this proposition we could, relying on Turner v. United States, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970), hold that the evidence was sufficient.[16] However, that proposition must be rejected. This court is aware from its own cases [17] that Treasury bills are stolen from institutions other than banks, credit unions and savings and loan associations. Moreover, and more tellingly, there was testimony in this very case by Harold Connor, Morgan's Assistant Vice President in charge of the Custody Department, regarding purchases of Treasury bills aggregating $37 million by the Morgan bank from the securities firms of Aubrey G. Lanston & Co. and Francis I. duPont & Co. Tr. 42–44. Connor further testified that, to cover its losses after the disappearance of the bills involved here was discovered, the Morgan bank purchased Treasury bills in the "open market." Tr. 55.[18] Thus, it is quite

tion of § 2113(c), told an undercover agent that the bills there involved were included on a list of securities missing from a particular bank. In this case, the Morgan bank circulated a similar list, but there is no evidence that any defendant saw it or was aware of it.

None of the other cases cited by the government—United States v. Brawer, 482 F.2d 117 (2d Cir. 1973); United States v. Jacobs, 475 F.2d 270 (2d Cir.), cert. denied, 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 (1973); United States v. Izzi, 427 F.2d 293 (2d Cir.), cert. denied, 399 U.S. 928, 90 S.Ct. 2244, 26 L.Ed.2d 794 (1970); and United States v. DeSisto, 329 F.2d 929 (2d Cir.), cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964)—involved § 2113(c). They were all prosecutions under different statutes which required only knowledge that goods were stolen, not that they were stolen from a particular kind of institution.

Finally, United States v. Hamilton, 457 F.2d 95, 99 (3d Cir. 1972), and United States v. Licausi, 413 F.2d 1118, 1121 (5th Cir. 1969), cert. denied, 396 U.S. 1006, 90 S.Ct. 560, 24 L.Ed.2d 498 (1970), relied on at oral argument, appear to hold only that under § 2113(c) there is no requirement that the defendant know the *particular* bank from which the property was stolen; they in no way vitiate the requirement that it be proven that the defendant knew the property was stolen from *some* bank. So far as *Licausi* may be thought to hold otherwise, we must respectfully differ.

**13.** Tr. 57. *Compare*, United States v. Hamilton, 457 F.2d 95, 99 (3d Cir. 1972) (stolen checks were imprinted with the name of the credit union from which they were stolen).

**14.** *Compare*, United States v. Whitney, 425 F.2d 169 (8th Cir.), cert. denied, 399 U.S. 935, 90 S.Ct. 2267, 26 L.Ed.2d 808 (1970).

**15.** *Compare*, Caldwell v. United States, 405 F.2d 613 (9th Cir.), cert. denied, 394 U.S. 1004, 89 S.Ct. 1603, 22 L.Ed.2d 783 (1969).

**16.** *Turner* involved the constitutionality of a presumption of knowledge that heroin and cocaine had been illegally imported from the fact of possession. The Court held that, since heroin is not produced in this country, "[t]o possess heroin *is* to possess imported heroin," 396 U.S. at 416, 90 S.Ct. at 652 (emphasis in original), and that the presumption of knowledge with respect to heroin satisfied the "beyond a reasonable doubt" test. It was further held that the presumption regarding cocaine failed to meet the "more likely than not" test since substantial amounts of cocaine are stolen domestically from legal sources. *Id.* at 418–19, 90 S.Ct. 642.

**17.** United States v. Brawer, 482 F.2d 117 (2d Cir. 1973); United States v. Jacobs, 475 F.2d 270 (2d Cir.), cert. denied, 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 (1973).

**18.** In testimony at the aborted first trial under the instant indictment, *see*, note 1, *supra*, Connor described a secondary market in Treasury bills made up of various government bond dealers.

clear that Treasury bills are handled in substantial volume by institutions other than those listed in § 2113(c), and it cannot be said with any assurance whatever that stolen Treasury bills are, *more* likely than not, Treasury bills that have been stolen from a bank.

We conclude, therefore, that there was no evidence on which the jury could have based a finding that the defendants knew, beyond a reasonable doubt, that the Treasury bills had been stolen from a bank. This failure of proof on an essential element of the crime requires that the judgments of conviction be reversed and the case remanded to the district court with instructions to dismiss the indictment.[19] In view of this holding, we need not consider any of the additional arguments raised on this appeal.[20]

■ We reverse these convictions with reluctance and regret. The evidence tending to prove that these defendants possessed stolen property knowing it to

have been stolen was overwhelming. Unfortunately, the statute under which the government chose to bring this prosecution required more, and on that additional element the government failed—and totally failed—to prove its case. Our system of administering justice requires that a defendant, no matter how guilty he may be of *some* crime, cannot be convicted unless there is proof beyond a reasonable doubt that he committed the *particular* crime with which he is charged. The prosecutorial branch of the law enforcement establishment is quite properly vested with considerable discretion in deciding what charges to bring against whom, but in this case the improvident exercise of that discretion—not only in selecting the particular statute under which the case proceeded, but also, and more fundamentally, in pursuing this matter in federal court rather than turning it over to state authorities for prosecution in a more appropriate forum—has caused the release of three proven criminals who ought to be in prison.[21] This is all the more distressing

19. Brandenburg v. United States, 78 F.2d 811 (3d Cir. 1935), involved the predecessor to the current 18 U.S.C. § 1708, which now prohibits possession of articles stolen from the mail knowing them to have been stolen. The earlier statute, 18 U.S.C. § 317 (1934 ed.) required proof of possession of articles stolen from the mail "knowing the same to have been so stolen." In *Brandenburg*, it was held that the word "so" meant that there was a requirement of knowledge that the articles had been stolen *from the mail*, and that when the proof only established knowledge that the articles were stolen, but not stolen from where, there could be no conviction. The stolen mail statute was amended in 1939 to delete "so" and thus to overrule *Brandenburg*. Barnes v. United States, *supra*, 412 U.S. at 847 n. 14, 93 S.Ct. 2357. That *Brandenburg* no longer applies to the stolen mail statute in no way impairs the soundness of its reasoning with regard to statutes such as § 2113(c) that do require knowledge of the source of the stolen goods.

20. Tavoularis claims that the trial court impermissibly restricted the scope of his cross-examination of DiRienzo by refusing to allow, for impeachment purposes, evidence that DiRienzo had been convicted of several crimes more than ten years prior to trial. While this court has, in considering the use of a *defendant's* prior convictions for impeachment, held

that the probative force of such convictions. diminishes with their age, it has declined to impose rigid age limitations. United States v. Puco, 453 F.2d 539, 543 (2d Cir. 1971). Here, however, the district court enunciated an absolute and inflexible ten-year rule with respect to *all* witnesses. Tr. 130–34. While we need not consider whether prejudicial error occurred thereby, we do note that, effective July 1, 1975, this absolute approach will be replaced by the more flexible provisions of Rule 609(b) of the Federal Rules of Evidence.

Tavoularis and Daniels challenge the authority of Strike Force attorneys to present a case to the grand jury. Even if this claim was not waived by the failure to raise it by pre-trial motion, *see* Davis v. United States, 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973), we have no occasion to reach it here.

21. There is some evidence that these defendants may be at least on the periphery of organized crime. DiRienzo testified that in the summer of 1970 Tavoularis approached him with a request to set up a meeting with one "Tommy Ryan" in order to determine "who ratted us out." DiRienzo had once worked for Ryan, but claimed that the relationship had been terminated. Tr. 239–40. Whether this "Tommy Ryan" is the same individual as the late Thomas Eboli, also known as "Tommy Ryan," an alleged higher-up in the ranks of

since the New York statute of limitations has most likely run, effectively barring state prosecution.[22] The blame for this unhappy but necessary result must be placed squarely on the shoulders of the Strike Force attorneys in charge of this case.

Reversed and remanded with directions to dismiss the indictment.

---

organized crime, is not spelled out in the record.

22. New York would probably charge the defendants with criminal possession of stolen property in the first degree, Penal Law § 165.-50 (McKinney's Consol.Laws, c. 40, 1967), a class D felony with a limitation period of five years, Crim.Proc.Law § 30.10, subd. 2(b) (McKinney 1971), and with conspiracy in the third degree, Penal Law § 105.05, a class A misdemeanor with a limitation period of two years, Crim.Proc.Law § 30.10, subd. 2(c). On March 4, 1970, Tavoularis was arrested with DiRienzo and Norman and the bills were

seized. It would seem possible that both of these statutes have therefore run. We certainly do not purport to decide that state law question here, however. On the record before us we cannot determine whether the fugitive provisions of Crim.Proc.Law § 30.10, subd. 4(a) might be applicable to Poerio and/or Daniels, or whether the conspiracy continued beyond March 4, 1970 to some date within the period of limitation. Nor would we care to speculate on whether the New York courts might imaginatively construe the tolling provision of § 30.10, subd. 4(b) as being applicable to federal prosecutions.