**UNITED STATES of America, Appellee,**

v.

**Martin KAPLAN, Defendant-Appellant.**

**No. 319, Docket 78–1233.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 26, 1978.
Decided Nov. 14, 1978.

Joel N. Rosenthal, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., for S. D. N. Y., Robert J. Jossen, Asst. U. S. Atty., New York City, of counsel), for appellee.

Barry Bassis, Legal Aid Society, Federal Defenders Services Unit, New York City, for defendant-appellant.

Before FRIENDLY, MULLIGAN and GURFEIN, Circuit Judges.

MULLIGAN, Circuit Judge:

Martin Kaplan was convicted by a jury after a trial before the Hon. Lawrence W. Pierce, United States District Judge, Southern District of New York, of conspiracy to possess, barter and sell, and the actual possession, barter and sale, of a one million dollar United States Treasury bill, knowing it to have been stolen from a bank, in violation of 18 U.S.C. § 371, and 18 U.S.C. §§ 2113(c) [1] and 2. Appellant received concurrent four-year sentences for each count. This appeal followed. We reverse.

█ In November, 1973, $15,350,000 in United States Treasury bills mysteriously disappeared from the Chase Manhattan Bank, at 1 Chase Manhattan Plaza, New York. The evidence, viewed in the light most favorable to the Government, established that in the spring of 1974, Thomas Rocco asked Kaplan to help find a buyer for a stolen one million dollar Treasury bill which Rocco's friend "John" was trying to sell. Rocco told Kaplan that the security was "hot" and Kaplan agreed to "look around" for someone who could "handle" it. Doris George, a bar owner and friend of Kaplan's, introduced Kaplan to Joe Moore, a former banker who had recently served a sentence for a conviction involving the sale of stolen securities. Moore agreed to find a buyer for the security. Kaplan arranged transportation for Moore to New York to meet Moore's contacts.

A few weeks later, Moore told Kaplan and Rocco that he had contacted a buyer for the Treasury bill. Kaplan did not attend any further meetings concerning the sale of the security, but prior to each meeting asked George to go with Rocco in his place and report back to him. At one such meeting, Rocco was introduced to FBI Agent John Hauss, who was posing as Frank Wagner, the buyer of the security. Rocco offered Hauss the one million dollar Treasury bill for $50,000 down with subsequent payments totalling several hundred thousand dollars. Rocco told Hauss that the Treasury bill was "hot," which Hauss stated to mean that the institution from which it was stolen was aware of the loss. Rocco also informed Hauss that he would be sharing the proceeds from the sale of the bill with five other people, including the original thief and Doris George.

█ The Treasury bill was sold at a final meeting between Rocco and Hauss at Jack Dempsey's Restaurant on May 15, 1974. On that occasion, Rocco asked Hauss what he intended to do with the Treasury bill. Hauss answered that the bill was to be deposited in a Swiss bank and that the funds would later be transferred by wire to a New York bank. Hauss also stated that it would be better to know the identity of the bank from which the bill was taken since it might pose a problem if the correspondent New York bank used to transfer the money was the same bank from which the bill had been stolen. Rocco agreed, but did not indicate from which bank the bill had been taken. He also suggested that Hauss not withdraw all the money at once

---

1. 18 U.S.C. § 2113(c) provides:

   Whoever receives, possesses, conceals, stores, barters, sells, or disposes of, any property or money or other thing of value knowing the same to have been taken from a bank, credit union, or a savings and loan association, in violation of subsection (b) of this section shall be subject to the punishment provided by said subsection (b) for the taker.

   Subsection (b) states:
   Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $100 belonging to, or in the care, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined not more than $5,000 or imprisoned not more than ten years, or both . . . .

in order to avoid suspicion. After Rocco gave Hauss an envelope containing the one million dollar Treasury bill, Hauss passed Rocco the money, and signaled the arrest of Rocco and George.

In January, 1975, Doris George agreed to cooperate with the Government and subsequently recorded two conversations with Kaplan. The first, on January 14, 1975, took place eight months after the arrest of George and Rocco. In that conversation, George feigned receipt of a grand jury subpoena, but Kaplan advised her not to worry since the authorities could only be interested in finding "whoever stole" the "bills out of the bank."[2] During the second recorded conversation in June, 1975, Kaplan again reassured George that the Government was only looking for the person who actually took the Treasury bills from the Chase Manhattan Bank.[3]

The sole issue on this appeal is whether the Government's proof was sufficient for the jury to find beyond a reasonable doubt that Kaplan knew during the conspiracy that the one million dollar Treasury bill had been stolen from a bank, as required by 18 U.S.C. § 2113(c). Under this court's holding in *United States v. Tavoularis*, 515 F.2d 1070 (2d Cir. 1975), we find that the evidence here was insufficient to support Kaplan's conviction.[4]

As in *Tavoularis*, the Treasury bill here mysteriously disappeared from the owner-bank, and the Government's case produced no evidence that the appellant participated in the theft or was acquainted with the actual thief. The evidence in this case established only that Kaplan was a middleman, several links down the chain from the actual thief. The additional fact relied on by the Government that Kaplan enlisted the aid of Moore, a former banker, to help him locate a buyer for the Treasury bill does not support any inference that Kaplan therefore knew that the security was stolen from a bank. A quondam banker would be helpful in locating a buyer irrespective of the source of the money. Nor does the fact that Rocco described the bill to Kaplan and Hauss as "hot" aid the Government. The testimony of agent Hauss indicates that this term does not signify the source of the security, but rather that the brokerage house or bank from which it was taken was aware of the loss.[5] Although the evidence indicates that Rocco knew that the Treasury bill was stolen from

---

2. Following are excerpts from the January, 1975 conversation between Martin Kaplan (MK) and Doris George (DG):

> MK: They're not looking for Thomas Rocco. They got Thomas Rocco. They're not looking for you. They're looking for whoever stole this fifteen, twenty, thirty million dollars out of the bank and all of it is recovered. They want to find out who stole this. Thats [sic] what they want. So it never happens again.
> DG: Humm, sigh
> MK: They had, they according to the newspaper they have everything that was stolen. But they don't have the guy who stole it.

Government Exhibit 1A, Government Appendix at 42.

> Kaplan closed the conversation as follows: They had fifteen of them and they all [have] been recovered according to the newspaper. The real culprit here is who took them out of the bank. That's what they're looking for. I think, now I'm not a genius, I'm not a a a professor.

Government Exhibit 1A, Appendix at 75.

3. Government Exhibit 2A, Government Appendix at 81–82.

4. Although trial counsel for Kaplan did not move for a judgment of acquittal under F.R. Cr.P. 29, failure by the Government to adduce sufficient evidence to warrant submission to the jury is a defect affecting substantial rights which we may notice under F.R.Cr.P. 52(b). The Government was not prejudiced by the lack of such a motion; counsel conceded at the argument before us that the prosecution could have offered nothing more to show Kaplan's knowledge.

5. Agent Hauss testified that:

> The distinction between hot and cold is [that] cold would mean freshly taken and the victim of the theft would be *a brokerage house or a bank* [which] was not aware yet of the fact that it had been taken.
> Hot would be that it is on the hot list, that it is known on the street in the Wall Street area and within law enforcement community and in the underworld that it's stolen and everybody knows that it is stolen.

Transcript at 638 (emphasis added).

a bank, the jury could not have reasonably inferred, based on the facts here, that this knowledge was imparted to Kaplan.[6] As we stated in *Tavoularis*, "Treasury bills are stolen from institutions other than banks, credit unions and savings and loan associations," and therefore the mere possession of a stolen Treasury bill does not necessarily violate 18 U.S.C. § 2113(c). 515 F.2d at 1076.

The post-conspiracy statements contained in the two recorded conversations between Kaplan and Doris George are the only direct evidence in the case that Kaplan knew that the Treasury bill was stolen from a bank. However, the first of these conversations occurred eight months after the actual arrest of Rocco and George. In addition, Kaplan referred in the first conversation to the newspapers, which undoubtedly reported that the bills had been stolen from a bank.[7]

As in *Tavoularis*, the evidence that appellant here knew that the Treasury bill had been stolen was overwhelming. However, the Government failed to establish sufficient evidence for the jury to find beyond a reasonable doubt knowledge that the bill had been stolen from a bank. See *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972). Accordingly, we reverse. Since defendant has been incarcerated pending appeal, we direct his prompt release.

---

6. The mere fact that Rocco and Kaplan were associated is not sufficient to support an inference by the jury that one imparted knowledge to the other. See *United States v. Whitney*, 425 F.2d 169, 170 (8th Cir.), cert. denied, 399 U.S. 935, 90 S.Ct. 2267, 26 L.Ed.2d 808 (1970), where the court noted that the mere association of defendant with those persons who had stolen the money from a savings and loan association was "not sufficient to give rise to more than suspicion."

7. See footnote, 2, *supra*.