UNITED STATES of America

v.

**Sidney PERKINS, Bernard Osser, Rose Morris, North Broward Industries, Inc., Government Sales Division Southern Commercial, Inc.**

Crim. No. 83–00002.

United States District Court,
E.D. Pennsylvania.

Feb. 13, 1984.

Peter J. Smith, Asst. U.S. Atty., Philadelphia, Pa., for plaintiff.

Thomas B. Rutter, Philadelphia, Pa., for defendants.

## MEMORANDUM OPINION

CAHN, District Judge.

Before me are motions for post-verdict relief filed by defendants Sidney Perkins, Bernard Osser and Rose Morris. The 42-count indictment in this case charged the above-named defendants with conspiracy to defraud the United States by rigging bids to a defense procurement agency. The Government alleged that defendant Sidney Perkins had set up six corporations to appear to be separate and independent vendors bidding competitively for defense contracts. Using these corporations, Perkins rigged and manipulated bids submitted to the Defense Industrial Supply Center in Philadelphia (DISC), an arm of the Department of Defense. The Government further alleged that Perkins, in exchange for cash and other gratuities, obtained technical drawings from Bernard Osser, a contracting officer at DISC, and Rose Morris, a file clerk at the Naval Air Technical Services Facility (NATSF) in Philadelphia. According to the Government, Osser assisted Perkins in preparing claims submitted to DISC in return for trips to Florida and other things of value and, in addition, negotiated with Perkins regarding future employment without informing his DISC superiors. The Government charged all defendants with conspiracy under 18 U.S.C. § 371, and with violations of the Racketeer Influenced

and Corrupt Organization Act (RICO), 18 U.S.C. § 1961 *et seq.* The Government charged defendant Perkins with separate counts of bribery, 18 U.S.C. § 201(b), offering gratuities, 18 U.S.C. § 201(f), wire fraud, 18 U.S.C. § 1343, and filing false claims, 18 U.S.C. § 287. The Government charged defendant Osser with accepting gratuities, 18 U.S.C. § 201(g), and acting, as a government official, upon a matter in which a contractor with whom he was negotiating future employment had a financial interest, 18 U.S.C. § 208(a).

A jury trial in this case began May 9, 1983. At the close of the Government's case, I granted a motion for acquittal in favor of Rose Morris, under Federal Rule of Criminal Procedure 29, as to the conspiracy and RICO counts of the indictment (Counts 1 and 2) (N.T. 12–260). On June 6, 1983, the jury returned a verdict of "guilty" as to all defendants. Defendant Perkins was found guilty of the conspiracy and RICO counts, and in addition was convicted of two counts of bribery (Counts 3 and 5), five counts of offering gratuities (Counts 19, 22, 24, 26 and 28), three counts of wire fraud (Counts 30, 31 and 32), and nine counts of filing false, fictitious or fraudulent claims (Counts 33–39, 41 and 42). Perkins was acquitted on five counts of offering gratuities (Counts 9, 11, 13, 15 and 17). Defendant Osser was found guilty of conspiracy, of accepting gratuities (Count 18), and of participating personally and substantially as a government officer in advising an entity with whom he was negotiating future employment (Count 20). Osser was acquitted of the RICO charge (Count 2), and of five charges of accepting gratuities (Counts 8, 10, 12, 14 and 16). Defendant Morris was found guilty of five counts of accepting gratuities (Counts 21, 23, 25, 27 and 29).

Each of these defendants seeks post trial relief. I will deny all of these motions for the reasons set forth below.

## I.

### Sidney Perkins

Perkins has filed two motions with this court: a motion for arrest of judgment as to Count 2 of the indictment (RICO) or in the alternative for judgment of acquittal as to Count 2; and a motion for a new trial as to the entire indictment or in the alternative as to Count 2.

The basis for the first motion is that the indictment's description of the "enterprise" here, the corporations controlled by Perkins, does not conform to the statutory definition of enterprise found in 18 U.S.C. § 1961(4).

Perkins argues that a group of corporations is not included within the section 1961(4) enterprise definition, and that the Government therefore did not prove the existence of a RICO enterprise. Section 1961(4) provides:

"Enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.

Perkins' argument is not persuasive, for two reasons. First, there is no reason to believe that Congress intended to restrict the category of entities that may constitute RICO enterprises to only those listed in the statute. A more literal reading of the statute suggests that the statutory listing is non-exhaustive, and that by use of the words "Enterprise includes," Congress intended the statutory language to be interpreted broadly. The Court of Appeals has recognized the non-exclusive nature of the statutory listing. *See United States v. Aimone,* 715 F.2d 822, 828 (3d Cir.1983) (group of individuals and single corporation may together constitute a RICO enterprise).

In addition, the Second Circuit Court of Appeals has explicitly held that an interpretation of section 1961(4) that would exclude a group of corporations from the enterprise definition would "make [n]onsense of the statute," *United States v. Huber,* 603 F.2d 387, 394 (2d Cir.1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980), especially in light of Congress' man-

date that RICO provisions shall be liberally construed to effectuate the statute's remedial purposes. *Id.* Judge Feinberg's reasoning in *Huber* is persuasive. *See also United States v. Aimone*, 715 F.2d at 828 (*citing Huber* with approval).

■ Perkins' motion for a new trial also relies upon a definitional section of the RICO statute. Perkins was convicted of five counts of offering gratuities to public officials in consideration of services performed, in violation of 18 U.S.C. § 201(f). Perkins argues that violations of section 201(f) should not be considered predicate offenses for purposes of the RICO statute.

In section 1961(1)(B), Congress has listed 18 U.S.C. § 201 as a predicate RICO offense, and following the section 201 listing is the parenthetical phrase "(relating to bribery)". Defendant argues, first, that there is a meaningful distinction between offering bribes (§ 201[b]) and offering gratuities (§ 201[f]); and second, that by its use of the phrase "(relating to bribery)," Congress intended that the RICO statute cover only section 201(b) violations.

This argument is without merit. Following each of the twenty sections of Title 18 listed in section 1961(1)(B) which may be used as predicate RICO offenses, there is a parenthetical phrase briefly describing the criminal activity covered by the statute, usually in the form of a summary of the statute's title. None of these parenthetical phrases are used to limit the reach or to discriminate among parts of the statutes they describe. The parentheticals are only "visual aids," designed to guide the reader through what would otherwise be a litany of numbers.

It is true that under federal law the offenses of bribery and gratuities are not similar in all respects; bribery requires proof of a "quid pro quo".[1] State law bribery, however, defined as a predicate RICO offense in 18 U.S.C. § 1961(1)(A),

includes any state statute covering "conduct which is intended, at least by the alleged briber, as an assault on the integrity of a public office or an official action." *United States v. Forsythe*, 560 F.2d 1127, 1137 n. 23 (3d Cir.1977), *citing United States v. Dansker*, 537 F.2d 40, 48 (3d Cir.1976). The five section 201(f) counts allege that Perkins funneled cash to Morris and gave airline tickets to Osser "for and because of official acts performed and to be performed" by them. There is no basis for distinguishing between federal and state law offenses encompassed by the general bribery category, and the section 201(f) counts here clearly fall within the *Forsythe* and *Dansker* definitions of RICO bribery.

Even if there were a valid reason to distinguish between sections 201(b) and 201(f) for purposes of RICO, however, the RICO count against Perkins would stand. This is true by virtue of the fact that Perkins was also convicted on two counts of section 201(b) bribery and three counts of section 1343 mail fraud, all five of which indisputably are predicate offenses under RICO.

For all of the above reasons, defendant Perkins' motions for post-verdict relief will be denied.

## II.

### Bernard Osser

Defendant Osser submits four bases for post verdict relief. First, Osser argues that there was insufficient evidence of conspiracy to submit the conspiracy count against him to the jury, and that his motion for acquittal as to the conspiracy count should have been granted at the close of the Government's case.

■ I agree with the Government that there was sufficient evidence to warrant the conclusion that Osser knowingly partic-

---

**1.** In addition, the penalties for bribery are up to 15 years imprisonment and a $20,000 fine, while the penalties for gratuities are up to 2 years imprisonment and a $10,000 fine. This difference is insufficient to delete § 201(f) offenses from the category of RICO bribery, inasmuch as any state law bribery offense punishable by imprisonment for more than just a single year may serve as a predicate RICO offense under 18 U.S.C. § 1961(1)(A).

ipated in the conspiracy and thus to justify submitting the conspiracy count against Osser to the jury.

Osser's position at DISC was Chief of the Post Award Branch, and his function was to review non-deliveries and late deliveries. There is substantial evidence that Osser assisted the Perkins' companies outside of his official capacity, in the pre-award stage. That evidence includes the repeated business and vacation trips taken by Osser to Florida at Perkins' expense, and substantial testimony by Sharon Gray, an employee of Perkins at Southern Commercial in Florida, who in effect was an unindicted co-conspirator in this case. Gray, who had been granted immunity (N.T. 3–97), testified to the following: Perkins said he was paying Osser while Osser was employed at DISC (N.T. 3–82); Perkins sent Osser special lists of drawings for parts (N.T. 3–44), and sent many of these lists to Osser's home address despite DISC office policy never to receive official mail at home (N.T. Berk 8–26); Osser, while a government employee, would send drawings via Federal Express in response to those requests to Perkins in Florida (N.T. 3–50, 3–242); Osser sent Perkins information on particular contracts filled by a Perkins company, which were the subject of a government investigation (N.T. 3–65); Osser retired early because of government investigations into his role at DISC (N.T. 3–80); Osser and Perkins reached an agreement about Osser's future employment with Perkins at North Broward Industries on April 24, 1981, and the employment contract stated that Osser's services had begun on February 16, 1981, the date of his early retirement from DISC (N.T. 3–86); Perkins stated, referring to the employment contract, that the contract would make it "legal" now (N.T. 3–84); Osser came to Perkins' establishment in Florida 6 to 7 times prior to February of 1981, the date of his DISC retirement (N.T. 3–87); Perkins put expenses for airline tickets, food and accommodations for Osser and his wife on Perkins' American Express card (N.T. 3–90); Osser aided Gray in formulating a letter on behalf of Bucks Aircraft Industries, Inc. (one of the Perkins' controlled companies) addressed to a DISC employee, in response to an inquiry concerning eight orders that had not been shipped (N.T. 3–94); Osser then reviewed the letter to determine if the DISC employee would accept Bucks' explanation (N.T. 3–236). Osser repeatedly failed to inform his superiors or to disclose to the appropriate people at DISC his continuing relationship with Perkins and with the Perkins-controlled companies (N.T. Burke 8–23–26).

In addition, Mr. William Redden, responsible as Branch Supervisor in the Quality Assurance Division at DISC for reviewing customer complaints about DISC material, testified that, from 1978 to 1979, he obtained aperture cards[2] and paper copies of drawings 3 to 4 times every month from the DISC drawing repository for Osser at Osser's request. He additionally testified that none of these drawings were ever returned to him (N.T. 6–46–7, 6–53).

Additional evidence came from Joel Lipschultz, owner of Precision Fasteners, Inc., one of the Perkins-controlled companies, who testified in accordance with a plea agreement with the United States government (N.T. 6–215). Lipschultz testified that in 1979, at the Elan Club in Philadelphia, he saw Perkins and Osser together. Osser was holding an envelope full of cash, and Perkins was holding an envelope containing aperture cards, and at least one card was stamped "limited," *i.e.*, proprietary (N.T. 7–36–38).

The jury was entitled to draw an inference of an illicit association from this evidence. As the Supreme Court has stated, the proof in these types of cases "by the very nature of the crime, must be circumstantial and therefore inferential to an extent varying with the conditions under which the crime may be committed." *Di-*

---

**2.** Aperture cards are government computer cards containing a microfilm copy of an engi-neering drawing for a defense-related part.

*rect Sales Co. v. United States,* 319 U.S. 703, 714, 63 S.Ct. 1265, 1270–71, 87 L.Ed. 1674 (1943).

Counsel for Osser submits two cases in support of his position that the government did not prove the specific knowledge needed to submit the conspiracy count to the jury. These two cases are *United States v. Tavoularis,* 515 F.2d 1070 (2d Cir.1975), and *United States v. Klein,* 515 F.2d 751 (3d Cir.1975). In these two cases there was no quantum of evidence *at all* from which an inference might be drawn that the defendant knew of the conspiracy's illicit purpose.[3] The instant case is quite different. For this reason, neither case is controlling here.

In summary, the testimony as reviewed supports my prior ruling that the evidence was sufficient to warrant the inference that Osser was a knowing participant in the conspiracy.

■ Mr. Osser's second basis for relief is that the testimony of William Redden regarding Redden's obtaining drawings from the DISC repository for Osser at Osser's request was unfairly prejudicial and should not have been admitted under Federal Rule of Evidence 403. I disagree. Osser testified that he obtained requests for drawings by Federal Express mail from Perkins at Osser's home (N.T. 12–207, 12–242), and that he would expedite the requests for DISC documents on Perkins' behalf (N.T. 12–208). The Redden testimony was offered to show that Osser had access to aperture cards, and used that line of access regularly over a substantial period of time. This evidence, together with Osser's own testimony, legitimately gives rise to an inference that Osser knowingly furthered the

objectives of the conspiracy by obtaining drawings for Perkins without disclosure to his superiors or fellow DISC employees.

■ Osser's third basis for relief is that there is insufficient evidence to support the jury's verdict of guilty on Count 20 of the indictment. Count 20 alleged a violation of 18 U.S.C. § 208(a), in that Osser, as a government employee, participated "personally and substantially" in a matter in which a company with whom he was negotiating employment had a financial interest. The jury found Osser guilty on Count 1, the conspiracy count, and I have found that there was sufficient evidence before the jury upon which it could base a finding that Osser knowingly furthered the criminal conspiracy. The evidence sustaining the conspiracy finding—the meeting at Elan, the Redden, Gray, and Lipschultz testimony, together with Osser's own testimony that he expedited document requests for Perkins although his official dealings with contractors were limited to the post-award phase—taken together amply support a finding that Osser aided Perkins "personally and substantially".

Osser's fourth basis for relief is that two items of testimony did not fall within the co-conspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E), and were improperly admitted. These items are the following: Sharon Gray, Perkins' employee at North Broward Industries, testified that Perkins said he was paying Osser while Osser was employed at DISC (N.T. 3–82). Margaret Gureghian, an employee at E.J. Wirth Co., a Perkins-controlled company, testified that on January 23, 1981, Perkins told her he found out through Osser that

**3.** *Tavoularis* involved a conspiracy to possess treasury bills knowing the bills to be stolen from a bank, in violation of 18 U.S.C. §§ 211(3)(c) and 371. The court held that the government had failed to prove that the defendants knew that the bills they possessed were stolen from a bank, an essential element of the § 211(3)(c) offense, and that "an inference of participation in the theft" on the facts of *Tavoularis* "would verge on the irrational." *Id.* at 1075. The § 211(3) offense was the centerpiece of the conspiracy and a failure of any proof at

all as to the offense's central element required reversal of the guilty verdicts. In *Klein,* the court reversed the conviction of a public insurance adjuster for mail fraud and conspiracy to defraud several insurance companies of proceeds owing on fire insurance policies, in connection with a scheme to destroy a hotel by fire for the policy proceeds. The appellant was hired after the arson to prepare proof of loss forms. The court found no evidence whatsoever of appellant's knowledge of an illicit purpose.

two of the Perkins-controlled companies, Wirth and Bucks Aircraft, were being investigated (N.T. 4–96–97). She also testified that Perkins had told her he was waiting to receive drawings from Osser (N.T. 4–68).

■ Co-conspirator statements may be admitted under Rule 801(d)(2)(E) only if they satisfy three requirements. First, the statements must have been made during the life of the conspiracy. Second, there must be independent evidence establishing that Osser participated in the conspiracy. Third, the Perkins' statements must be in furtherance of the conspiracy. *See United States v. Nixon*, 418 U.S. 683, 701, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974); *United States v. Ammar*, 714 F.2d 238, 245 (3d Cir.1983).

■ The first requirement of the rule is satisfied here. Under the second requirement, the prosecution must lay a foundation for the admission of co-conspirator hearsay by establishing the existence of a conspiracy including Osser by "a fair preponderance of independent evidence". *United States v. Trotter*, 529 F.2d 806, 811–13 (3d Cir.1976). This "preponderance" standard simply requires the trial judge to find "that the existence of the contested fact is more probable than its nonexistence." *United States v. Trotter*, 529 F.2d at 812 n. 8. The prosecution must show Osser's participation in the conspiracy, *i.e.*, agreement, by independent evidence, *United States v. Klein*, 515 F.2d 751, 753, but "[p]articipation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and collocation of circumstance.'" *United States v. Schoenhut*, 576 F.2d 1010, 1027 (3d Cir.), *cert. denied*, 439 U.S. 964, 99 S.Ct. 450, 58 L.Ed.2d 421 (1978), *citing Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469,

86 L.Ed. 680 (1942). Evidence of participation in the conspiracy must be considered in the light most favorable to the government on review of the jury's guilty verdict. *Id.* at 1014. The non-hearsay Gray testimony, the Lipschultz testimony, the Redden testimony, together with the repeated trips to Florida, the document requests addressed to Osser's home, his own admission that he expedited matters at DISC for Perkins despite the fact that pre-contract matters were not within the scope of his DISC position, his failure to disclose at any time his dealings with Perkins to his DISC superiors, all support my initial finding that Osser participated in the conspiracy.[4]

The third requirement that must be met in order for co-conspirators' statements to be admissible is that the statement must be "in furtherance" of the conspiracy. It is true that statements made by Perkins about Osser to those who are not involved in the conspiracy in any way would not satisfy the "in furtherance" requirement. *United States v. Provenzano*, 620 F.2d 985, 1000–01 (3d Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980). Here, both Gray and Gureghian were granted immunity by the government. Both were key employees in Perkins' operation, essential figures in the process by which Perkins' directives were carried out and low bid information was received and transmitted from DISC to Perkins' offices in Florida. In effect, Gray and Gureghian were unindicted co-conspirators. As such, they were not mere bystanders to the conspiracy, mere "errand runners". *See Provenzano* at 1001 (although statement to bystander does not fall within co-conspirator exception, statement to employee who ran conspirator's business is "in furtherance" of conspiracy).

■ Accordingly, the three requirements are satisfied, and the Perkins' statements

---

**4.** There is no requirement that the independent evidence of Osser's involvement in the conspiracy be introduced prior to the introduction of the Perkins' statements; and, accordingly, my decision to admit these statements subject to later validation by the prosecution's laying of the proper basis for admitting the questioned

evidence is not error. *United States v. Ammar*, 714 F.2d 238, 246–7 (3d Cir.1983); *United States v. Zepeda-Santana*, 569 F.2d 1386, 1388 (5th Cir.), *cert. denied*, 437 U.S. 907, 98 S.Ct. 3098, 57 L.Ed.2d 1138 (1978); *United States v. Jackson*, 549 F.2d 517, 533 (8th Cir.), *cert. denied*, 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977).

were properly admitted under Rule 801(d)(2)(E).

For all of the above reasons, the Osser motions for post-verdict relief will be denied.

## III.

### *Rose Morris*

Morris submits three grounds in support of her motion for a new trial: first, that Morris was prejudiced by the U.S. Attorneys' mischaracterization of some of the evidence against Morris in their closing arguments; second, that the court erred in permitting counsel for Perkins to question witness Daniel Lipschultz about his dealings with Morris immediately prior to the time period of the conspiracy; and third, that the court erred in denying a motion for severance or for a mistrial following the grant of Morris' motion for acquittal as to the conspiracy and RICO counts of the indictment, and following the admission of the Lipschultz testimony. Each of these arguments will be considered.

### A. *Prosecutorial Misconduct*

■ One Assistant United States Attorney, in his initial closing argument, mischaracterized the testimony of Dorothy Boggs, a government witness, as follows: "A fellow co-worker of Rose Morris ... observed that Rose Morris tried to carry out a whole shopping bag of drawings. What happened? She was stopped. They found out about it and she was admonished and told never to do it again." (N.T. 13–210–11). In fact, the Boggs' testimony was very different, as follows: "I had seen her put a stack of drawings in a shopping bag ... [u]nder her desk ... [j]ust once." (N.T. 7–214–5). Boggs also testified that she had mentioned the incident to another employee at DISC, Nancy Richardson, who talked to Morris and also mentioned it to Morris' supervisor, but knew nothing about Morris' being "admonished" or "told never to do it again." (N.T. 7–215–16).

Counsel for Morris corrected any misimpression that the United States Attorney's closing statement might have made by reminding the jury of the actual testimony. (N.T. 14–98).

In rebuttal, the other Assistant United States Attorney characterized Morris' direct testimony incorrectly, taking as his point of departure that Morris had admitted that she had provided Joel Lipschultz with drawings even after she believed he had left government employ. He then analyzed the remainder of her testimony against this background and urged upon the jury his belief that, taken as a whole, her story was not believable. (N.T. 14–124–5). In fact, Morris had testified that she stopped expediting the processing of drawings for Lipschultz as soon as she believed he had left government employ.

In my charge to the jury, I emphasized that the lawyers' statements are not evidence. (N.T. 14–132). I said the following: "There was so much evidence in this case that on occasion the lawyers, in their closing arguments, have presented what they thought the facts to be to you and another lawyer presented a different set of facts. You are not bound by what the lawyers say about the facts. You use your own collective judgment ... [I]t's your recollection that controls." (N.T. 14–133). I repeated this instruction to the jury throughout the trial. Any prejudice that may have resulted to Morris from the prosecutors' statements was neutralized by this instruction. *See United States v. Brisco*, 473 F.Supp. 303, 308 (D.Del.1979), *aff'd w.o. opinion*, 615 F.2d 1354 (3d Cir.1980).

### B. *Motions for Severance or a Mistrial*

■ Counsel for Morris also argues that the court erred in not granting a severance or mistrial at several phases of the proceedings: before the start of the trial; following the grant of acquittal as to the conspiracy and RICO counts; and following two separate items of testimony. These items were, first, testimony by Margaret Gureghian that Perkins had identified Morris as one of the sources for drawings; and second, testimony by Daniel Lipschultz during cross-examination by counsel for Perkins that Lipschultz had gotten documents from Morris in the year before

the start of the conspiracy alleged in the indictment. (Counsel for Perkins had alleged that this evidence was relevant to Perkins' defense of extortion by Morris or other government officials.) Counsel for Morris asserts that the admission of this testimony, along with the spillover effect of the days of testimony relating to Perkins' scheme to defraud the United States Government using documents supplied in part by Morris, taken together are sufficiently prejudicial to Morris to warrant a new trial.

There was no error in refusing a severance pretrial; there is no allegation that the naming of Morris in the conspiracy and RICO counts of the indictment was in bad faith.

The denial of Morris' subsequent motions for severance is more troublesome, and warrants some discussion of each of the points raised by her counsel. On balance, I find that the highlighted testimony does not represent the compelling or substantial prejudice necessary to support her assertion that the trial as to Morris was unfair. My reasoning is as follows:

1. Spillover Effect and Gureghian's Testimony.

The Government's method of presenting its evidence in this case carefully delineated separate events and occurrences, and thus protected against confusion. My observation of the jury leads me to believe that it was able to follow my instructions to keep the evidence compartmentalized as to each defendant. (N.T. 14–141). The only point of intersection between the evidence presented relating to Perkins' operations and the separate evidence about the dealings between Morris and the Lipschultzes came from Margaret Gureghian. Gureghian said that Perkins had told her that Morris was the source of the drawings from NATSF (N.T. 4–61; 4–68). This statement was clearly admissible against Perkins as an admission by a party opponent under Rule 801(d)(2)(A) and was offered by the government only against Perkins to show his knowledge and state of mind. I specifically instructed the jury

that the statement was to be considered only as to Perkins and not against Rose Morris. (N.T. 4–67). In light of that instruction, this statement was not sufficiently prejudicial to warrant the grant of a new trial. *See United States v. Losada,* 674 F.2d 167, 171 (2d Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982).

2. Cross-Examination of Daniel Lipschultz.

Daniel Lipschultz testified that he worked for the Department of Defense until January of 1978, and then left to work for Pooley Machine Co. along with his son, Joel, where he met Sidney Perkins. While at Pooley, part of his responsibilities involved obtaining aperture cards from DISC and NATSF. He left Pooley in January of 1979 to work for Perkins. He testified that during the month he remained in Philadelphia as a Perkins employee he obtained drawings from Rose Morris at NATSF on an expedited basis, (N.T. 6–151), and in return would pay $5.00 in cash for each drawing. (N.T. 6–152–3). In addition, he received government request forms for drawings from Morris. (N.T. 6–166). On cross-examination by counsel for Perkins, I allowed inquiry into the start of the relationship between Lipschultz and Morris as relevant to Perkins' defense that Morris was extorting the payments for drawings. (N.T. 6–83). The conspiracy alleged in the indictment began in January, 1979. Lipschultz revealed that his relationship with Morris began in 1978, (N.T. 6–189), and that at that point Morris said she would provide expedited service for $5.00 per drawing. (N.T. 6–191). Counsel for Morris moved for a mistrial based upon the admission of this evidence (N.T. 6–236). I held the evidence relevant to Morris' state of mind as to the bribery counts in anticipation of Morris' defense that she believed Lipschultz to be a government employee. (N.T. 6–236). I offered to give cautionary instructions to the jury that the evidence should not be used in evaluating the guilt or innocence of Morris but only in evaluating the Perkins' defense of extortion.

(N.T. 7–2). Counsel for Morris asked that the instruction not be given at that time but indicated that she would request such an instruction at the close of trial. (N.T. 7–3). Counsel for Morris did not ask that this instruction be given.

The case against Morris turned on the relative credibility of Morris and of Daniel and Joel Lipschultz. The Lipschultzes testified that they gave lists of drawings to Morris and received drawings in return at $5.00 per copy over the conspiracy time period. The drawing request rapidly accelerated to 500 to 600 per week. Morris filled 15 to 20 percent of their requests (N.T. 6–160–61) and they paid Morris approximately $2,000.00 per month over a substantial period of time during the conspiracy. The indictment alleged only five monthly payments to Morris of $2,000.00 each, spread over the period between January of 1981 and February of 1982. Subsequent to the Lipschultz testimony, I granted Morris an acquittal as to the conspiracy charge of the indictment and therefore the evidence from the Lipschultzes as to payments in 1979 and in 1980 in retrospect, under the defense theory, also should not have been admitted. However, I instructed the jury that Morris was not charged as a conspirator, (N.T. 14–147), and that she was charged only with five separate incidents in separate months of receiving $2,000.00 in exchange for the drawings. I explained: "She denies that she did that and that is a very clear factual decision for you to make. Do you accept the Lipschultz testimony or the Morris testimony? The burden of proof is on the government." (N.T. 14–167; *see also* N.T. 14–132). "The defendants say ... that it is just as likely that Lipschultz was pocketing the money and pointing the finger at other persons. This is your function: to determine which of those contentions is correct, keeping in mind that for the government to sustain a conviction it must prove its contentions beyond a reasonable doubt." (N.T. 14–171). I recommended to the jury that it evaluate the case against Morris first, at the very start of their deliberations, before they reached any of the other evidence in the

case. (N.T. 14–180). I told the jury to focus on the credibility of the Lipschultz version as opposed to the Morris explanation. I also stressed that the jury's job was to compartmentalize the evidence as to each defendant. (N.T. 14–141). The jury accepted the Lipschultz testimony, and there was more than an ample basis for its conclusion. In this fact situation, the admission of testimony as to activities by Morris in 1978, if it was error at all, was harmless.

For all of the above reasons, defendant Morris' motions for post-verdict relief will be denied.

An appropriate order will be entered denying post-verdict relief as to all defendants.