**UNITED STATES of America, Appellee,**

v.

**Leonard J. EISENBERG, Appellant.**

**No. 410, Docket 78–1275.**

United States Court of Appeals, Second Circuit.

Argued Dec. 1, 1978.
Decided March 9, 1979.

---

Joel A. Brenner, East Northport, N. Y. (Edward M. Chikofsky, New York City, Helene Freeman, New York City, and Albert J. Krieger, Miami, Fla., of counsel), for appellant.

Pamela Rogers Chepiga, Asst. U. S. Atty., S. D. New York, New York City (Robert B. Fiske, Jr., U. S. Atty., and Robert J. Jossen, Asst. U. S. Atty., S. D. New York, New York City, of counsel), for appellee.

Before MOORE, FRIENDLY and GURFEIN, Circuit Judges.

**524**

GURFEIN, Circuit Judge:

This is an appeal from a judgment of conviction in the District Court for the Southern District of New York (Hon. Charles S. Haight, Jr.), for conspiracy to transport counterfeit checks in interstate commerce, and for aiding and abetting the transportation, in violation of 18 U.S.C. §§ 2314, 371 and 2.[1]

Appellant Eisenberg, a criminal defense attorney, was retained to represent one Isiah Crutch in 1970 with respect to a New York State criminal charge of grand larceny and fraud. Thereafter, Eisenberg represented Crutch in a number of other criminal cases in both state and federal courts. Appellant also developed a close social relationship with Crutch. In 1974 Crutch established and headed an organization which manufactured and passed counterfeit bank checks. Appellant agreed to represent any member of the Crutch organization who got into "trouble" and Crutch agreed to pay all the legal fees involved.

According to the evidence, Eisenberg was introduced in April 1975 by Robert Lander to Stephen L. Rowe, who had recently been arrested for possession of goods stolen from an interstate shipment. During their meeting in appellant's office, Rowe indicated that he was "into all sorts of different things," to which Eisenberg responded by saying that as an attorney "he had to be very, very careful" but that "given the right situation he would be interested."

In late July, Rowe was told by a criminal associate, Michael Silberberg, that he needed capital to finance the purchase of several million dollars worth of stolen American Express Traveler's checks. On July 24, Rowe telephoned appellant and informed him that he had "something interesting" to discuss with him. Appellant suggested a meeting that night at a "health club" called The Fifth Season. Eisenberg asked Crutch, who was with him during the phone conversation, to join him at the meeting.

Eisenberg and Crutch met Rowe and Silberberg at the door of The Fifth Season, and Eisenberg secured and paid for the admission of the entire party. Introductions were made by first name only. Except for Silberberg, the men disrobed in accordance with club policy; clad in towels, they then proceeded to the club pool. When Silberberg asked why the meeting was held in such a place, appellant said that disrobing would protect against anyone wearing a "wire." To allay appellant's fears, Silberberg opened his shirt and demonstrated that he was not wired.

Leaving Crutch and Silberberg to proceed to the pool, Eisenberg and Rowe went to one side and held a brief conversation, in which Eisenberg vouched for Crutch as a "worthwhile person" and Rowe, in turn, vouched for Silberberg. Appellant and Rowe then joined Crutch and Silberberg at the pool. In appellant's presence, Silberberg began to detail a proposal for purchasing the stolen American Express Traveler's checks. There was a discussion among all four men concerning the checks, including such topics as how the checks were stolen and possible plans for their disposal in Las Vegas or abroad. Appellant, in particular, inquired about the value of the checks. After about fifteen minutes of conversation about the checks, appellant declared that the deal involved too much risk for too little return and that he was not interested.

Later appellant told Rowe privately that Crutch was big in "paper." The four agreed to meet again at The Fifth Season the following week.

A week later the party returned to The Fifth Season and were admitted at Eisenberg's request. Crutch and Silberberg went off by themselves and discussed the possibility of counterfeiting some stolen bank checks. At the same time, Eisenberg sponsored Rowe and Silberberg for membership

1. Appellant was sentenced on the conspiracy count to a term of imprisonment of two years, with the execution of the prison sentence to be suspended after six months and the remaining eighteen months to be served as a probationary period. On the substantive count imposition of sentence was suspended and appellant was placed on eighteen months' probation to run concurrently with the probation period under Count One.

at The Fifth Season. After this second meeting was concluded, Crutch told Eisenberg that something might be "cooking."

Finally, on August 7, the group convened once again at The Fifth Season. Crutch and Silberberg went into the club game room and the former laid out a display of counterfeit checks from several banks. Silberberg told Crutch to counterfeit one hundred Bankers Trust checks in the face amount of $1.75 million for which he would be paid with several genuine stolen checks and $20,000 in cash. Rowe came into the game room at several points during the Crutch-Silberberg conversation and, according to Silberberg's testimony, appellant entered for a moment and commented upon how good a job of counterfeiting had been done. Crutch denied that appellant had seen the counterfeit checks.

Two weeks later, Eisenberg had a meeting with Rowe and Lander about a pending criminal case against them, and Rowe brought appellant up-to-date on the ongoing counterfeiting scheme with Crutch and Silberberg. Eisenberg reminded Rowe that if the matter came up, he had been present acting as Rowe's attorney.

At the end of August, Crutch, Silberberg and Rowe met at The Fifth Season and delivery of the counterfeit checks was effected. Ninety of these checks with an aggregate face value of $1.615 million were ultimately sold to an FBI undercover agent in Washington, D.C.

Appellant contends that (1) there is insufficient evidence to support the verdict; (2) prejudicial hearsay was erroneously admitted; and (3) the charge was erroneous. He also asserts that the denial of his motion for a new trial was erroneous.

The Government contends that the evidence established that appellant participated in the scheme in at least three significant ways: first, he brought the parties together and vouched for their reliability and effectiveness; second, he provided a "safe haven" where the scheme was conceived and executed; and third, he expected a share of the profits. Crutch, Rowe and Silberberg each testified for the prosecution.

*Sufficiency of the Evidence*

We assess the sufficiency of the evidence by regarding it in the light most favorable to the Government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Ruffin*, 575 F.2d 346, 353–54 (2d Cir. 1978).

■ Appellant's theory is that, though he was present at the club while Crutch, Rowe and Silberberg conspired to sell counterfeit checks, he was not himself a participant in those meetings, but only attended at the club, at least initially, in his capacity as attorney for Rowe, one of the participants. Thus, he contends that he neither performed any act in furtherance of the conspiracy nor possessed sufficient knowledge of what his companions were planning to be deemed a co-conspirator or aider and abettor.

There was ample basis to find that appellant had knowledge of the conspiracy's purpose, including testimony that he saw sample checks and acknowledged them to be counterfeit; indeed, evidence was offered to show that Eisenberg made conscious attempts to avoid entanglement in the discussions he had fostered, as by making a point of insisting that he was present at The Fifth Season as Rowe's counsel. The evidence produced at trial, moreover, permits the conclusion that appellant did play a role in the conspiracy. The jury could well have found that Eisenberg brought together the various members of the conspiracy, vouched for their reliability, e. g., *United States v. Tramunti*, 513 F.2d 1087, 1109 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975), and facilitated their use of The Fifth Season as a "safe haven," *United States v. Terrell*, 474 F.2d 872, 875 (2d Cir. 1973), for the planning and promotion of the conspiracy. These facts were sufficient to allow the jury to determine that appellant played host to the conspiracy and associated himself with it. *See also United States v. Calabro*, 449 F.2d 885, 890 (2d Cir. 1971), *cert. denied*, 404 U.S. 1047, 92

S.Ct. 728, 30 L.Ed.2d 735 (1972); 405 U.S. 928, 92 S.Ct. 978, 30 L.Ed.2d 801 (1972).

■ Building his argument on *United States v. Tavoularis*, 515 F.2d 1070 (2d Cir. 1975), appellant argues ingeniously that failure to prove that appellant knew specifically that the counterfeit checks were to be transported in *interstate commerce* was fatal to the prosecution case. In *Tavoularis*, the prosecution, under 18 U.S.C. § 2113(c), was for possession of securities "knowing the same to have been [illegally] taken from a bank." The court held, "[i]t is clearly an essential element of a crime under that statute that the defendant had knowledge that the property he possessed was stolen *from a bank*." 515 F.2d at 1074 [emphasis in original].

In the statutory provision involved upon this appeal, however, there is no additional requirement of knowledge except that the securities transported were "falsely made, forged, altered, or counterfeited." 18 U.S.C. § 2314. The element of interstate transportation is merely a jurisdictional element, for which proof of the fact of transportation is proof enough. *United States v. Tannuzzo*, 174 F.2d 177, 180 (2d Cir.), *cert. denied*, 338 U.S. 815, 70 S.Ct. 38, 94 L.Ed. 493 (1949); *see United States v. Cowden*, 545 F.2d 257, 263 (1st Cir. 1976), *cert. denied*, 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977). Indeed, this court repeatedly has refused to find knowledge of the jurisdictional fact to be an essential element in prosecutions under other statutes as well which parallel the elements of § 2314. *See e. g. United States v. Viruet*, 539 F.2d 295,

297 (2d Cir. 1976) (per curiam); *United States v. Green*, 523 F.2d 229, 233–34 (2d Cir. 1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976).[2]

■ It being clearly established that requisite knowledge was proved for conviction of the substantive offense, it now follows that the same knowledge is enough as well to establish the conspiracy to commit the substantive offense. *United States v. Feola*, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). The requirement of *mens rea* as an element in the substantive offense makes it the kind of offense that requires no further element of additional knowledge of the jurisdictional fact to make out the conspiracy. *Id.*

*Hearsay Testimony*

Appellant argues that the admission of three types of hearsay evidence requires reversal notwithstanding the lack of objection by trial counsel.[3] The hearsay consists of: (1) "background" testimony, defined as the April 1975 conversation between appellant and Rowe in appellant's office; (2) so-called pre-conspiracy statements, asserted by appellant to be all conversations which occurred before August 7, 1975; and (3) prior statements of alleged nonconspirator witnesses, defined by the appellant as the testimony of Rowe, Lander and Silberberg.

■ 1. In April 1975, Eisenberg told Rowe that as an attorney he had to be "very, very careful", but that "given the right situation" he might be "interested." This was not only a prelude to the conspir-

**2.** Nor is *United States v. Scandifia*, 390 F.2d 244, 249 (2d Cir. 1968), *vacated on other grounds sub nom. Giordano v. United States*, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969), to the contrary. In *Scandifia*, the appellant, who had been charged as a principal and not as a co-conspirator, argued that others with whom he dealt on an arms-length basis caused the interstate transportation. He acknowledged that *Tannuzzo* permitted holding one confederate or aider and abettor liable for interstate transportation of counterfeit securities by another confederate or by the principal. *See United States v. Scandifia*, No. 31705, Appellant's Reply Brief 1–3. Hence, both *Tannuzzo*

and the instant case are distinguishable from *Scandifia*. Beyond that the *Scandifia* dictum seems inconsistent with what was later decided in *United States v. Blassingame*, 427 F.2d 329 (2d Cir. 1970), *cert. denied*, 402 U.S. 945, 91 S.Ct. 1629, 29 L.Ed.2d 114 (1971).

**3.** The only hearsay objection made by appellant's counsel was the standard one that coconspirator's statements were being taken "subject to connection." Judge Haight held such evidence admissible under *United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970).

acy which was later to be more circumscribed in nature, but it was an admission of intention by the defendant which is outside the hearsay rule. Rule 801(d)(2)(A) of the Federal Rules of Evidence.[4]

■ 2. Appellant also contends that the conspiracy began no earlier than August 7, 1975, so that much of the testimony regarding discussions before that date would be inadmissible hearsay. He did not ask Judge Haight to fix a starting date for the conspiracy, and Judge Haight did not do so in his *Geaney* ruling. However, the conspiracy may be said to have begun on July 24, 1975 when Rowe telephoned appellant, said he had something interesting to discuss and set up the first meeting at The Fifth Season. Rowe's statements at the meeting were in furtherance of the conspiracy then beginning to take more definite shape. There were no other significant pre-July 24 conversations.

■ 3. Appellant contends further that Rowe, Silberberg and Lander were not co-conspirators but Government informants and that any hearsay declarations attributed to them could not be admitted as being in furtherance of the conspiracy. If these people were, indeed, *acting* as Government informants throughout the alleged conspiracy, their declarations could not be admitted on a theory of agency. *Sears v. United States*, 343 F.2d 139, 142 (5th Cir. 1965); *see United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977).

■ The difficulty with appellant's argument, however, is that both Silberberg and Rowe, although at times they acted as informants in other matters, did not act as informers in the course of this conspiracy. They were not agents for the Government but were off on a frolic and detour for their own private profit. Indeed, defense counsel at trial recognized that Rowe was in fact an

accomplice. And Silberberg was indicted and convicted for participating in this very scheme and was sentenced to a term of imprisonment therefor. *United States v. Silberberg*, 573 F.2d 1299 (2d Cir. 1977) (table), *cert. denied*, 435 U.S. 953, 98 S.Ct. 1582, 55 L.Ed.2d 804 (1978). He testified that he did not tell the FBI about this "paper" scheme. As to Lander, none of his own out of court hearsay statements were admitted.

### Charge to the Jury

Appellant attacks the charges to the jury given by the trial court with respect to the elements of conspiracy and of the substantive offense and with respect to "conscious avoidance" as knowledge. He further contends that a supplemental charge delivered in response to a note from the jury was improper because it contained references outside of the scope of the jury's request.

■ We do not find the initial charge on the elements of conspiracy—and, specifically, on the requirement of knowledge—to be either incorrect on the law or so confusing as to require reversal. The charge relating to the four elements of the substantive crime was correct. Appellant claims error, however, on the ground that the trial judge charged that it was not required that the Government prove that the defendant—indicted for aiding and abetting—personally performed "each *act* necessary" to satisfy these four elements [emphasis added]. We do not agree that this misled the jury into believing that the *state of mind* of a principal could be imputed to the appellant; the charge as a whole made it clear that defendant's personal knowledge would have to be proved. Furthermore, even if Judge Haight could have been clearer on this point, no objection was taken.

---

4. Appellant also argues that Judge Haight erred in denying appellant's motion to strike Rowe's testimony concerning this conversation on the ground that its prejudicial effect outweighed its probative value. Judge Haight had sustained an objection made on a similar ground to testimony of Lander who would have testified that

Rowe's and appellant's remarks occurred in the context of a discussion of appellant's possession of stolen office equipment. Judge Haight deemed Rowe's testimony less prejudicial because it did not portray Eisenberg as a recipient of stolen property. We see no reason to disturb this ruling.

■ The charge on conscious avoidance was, as we noted earlier, warranted by the evidence and was adequately balanced. The judge made the jury aware of " 'countervailing considerations.' " *United States v. Morales,* 577 F.2d 769, 774 & n.4 (2d Cir. 1978).

Finally, the supplemental charge in response to the jury's note, though it perhaps went into greater detail than was strictly required by the jury's request, was properly responsive and not so weighted against the defendant as to be unfair.

*Denial of Motion for a New Trial*

Our reading of the trial judge's statement in connection with his denial of appellant's motion for a new trial does not indicate to us that he applied the wrong legal standard in exercising his discretion under Fed.R.Crim.P. 33.

We reject appellant's other contentions as meritless without further comment.

For these reasons, the judgment below is affirmed.