**UNITED STATES of America,
Appellee,**

v.

**Joseph MONTELEONE, Sr., also known as "Joe Monte", Joseph Russo, also known as "Jo Jo" and Anthony Russo, also known as "Chuckie", Defendants–Appellants.**

Docket Nos. 99–1168 to 99–1171, 99–1209 and 99–1221.

United States Court of Appeals, Second Circuit.

Argued March 5, 2001.

Decided July 20, 2001.

Cecil C. Scott, Assistant United States Attorney (Loretta E. Lynch, United States Attorney for the Eastern District of New York, NY, Patricia Notopolous, Assistant United States Attorney, on the brief) Brooklyn, NY, for Appellee.

Vivian Shevitz, South Salem, NY, for Defendant–Appellant Joseph Monteleone, Sr.

Herald Price Fahringer, Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria (Er-

ica T. Dubno, on the brief) New York, NY, for Defendant–Appellant Joseph Russo.

Alan S. Futerfas, New York, NY, for Defendant–Appellant Anthony Russo.

Before: WALKER, Chief Judge,
OAKES and CALABRESI, Circuit
Judges.

JOHN M. WALKER, JR. Chief Judge:

Joseph Russo, Anthony Russo, and Joseph Monteleone, Sr., appeal from judgments entered March 22, 1999 in the United States District Court for the Eastern District of New York (Charles P. Sifton, *District Judge*) convicting them, after a jury trial, of racketeering and racketeering conspiracy in violation of 18 U.S.C. §§ 1962(c) and (d); murder and conspiracy to commit murder in furtherance of racketeering in violation of 18 U.S.C. § 1959; conspiracy to make extortionate extensions and collections of credit in violation of 18 U.S.C. §§ 892 and 894; and using and carrying firearms in furthering these crimes in violation of 18 U.S.C. § 924(c). Each defendant was sentenced principally to life imprisonment on each of the racketeering and substantive murder charges and nine years for the murder conspiracy. The Russos were each sentenced to twenty years' imprisonment for the loansharking conspiracy. All of the foregoing prison terms were concurrent, to be followed by consecutive five-year terms for the weapons offenses.

This case has been before this court in a prior incarnation. *See United States v. Orena*, 145 F.3d 551 (2d Cir.1998) (reversing the grant of a new trial and reinstating the defendants' convictions on the basis that the government non-disclosures were not material in light of substantial other evidence of guilt), *rev'g*, *United States v. Persico*, CR–92–0351, 1997 WL 867788 (E.D.N.Y. Mar.13, 1997). The defendants now appeal directly from both their judgments of conviction and from the district court's March 18, 1999 Memorandum and Order denying their second Rule 33 motion for a new trial. We affirm the defendants' convictions and the denial of a new trial.

## BACKGROUND

In our earlier opinion we recounted much of the factual background pertinent to the instant appeal, as follows:

This case arises from the deadly internal war within the Colombo Organized Crime Family of La Cosa Nostra (the "Colombo Family") that began in 1991 when the Colombo Family split into two opposing factions—one loyal to the incarcerated "official" boss of the family, Carmine Persico, Jr., and the other loyal to the appointed acting boss, Victor J. Orena....

On May 13, 1993, a fifteen-count superseding indictment was returned against ... Joseph P. Russo, Anthony Russo, and Joseph Monteleone, Sr.-and co-defendants Alphonse Persico, Joseph Tomasello, Theodore Persico, Sr., Richard Fusco, Robert Zambardi, Lawrence Fiorenza, Lawrence Mazza, and James Delmastro.

. . . .

The Trial Evidence

The government's evidence at trial came primarily in the form of testimony from four accomplice witnesses—Lawrence Mazza, Carmine Sessa, Joseph Ambrosino (all members of the Persico faction), and Salvatore Miciotta (a member of the Orena faction)-and revealed the following:

Joseph and Anthony Russo were captains in the Colombo Family, and in 1992, after the intra-family war commenced, Joseph Russo was named act-

ing underboss within the Persico faction; Monteleone was a member of the Russos' crew. After an unsuccessful attempt by Persico loyalists to kill Victor Orena in June 1991 inflamed tensions within the Colombo Family, Sessa attended a meeting that included the Russos, Monteleone, and others, during which the Russos told Sessa that they would call in their men and tell them to prepare for war with the Orena faction. Miciotta, at the time a member of the Russos' crew, testified that he was called to a meeting by the Russos at which the Russos told him and other members of the crew about the intra-family war, and to ready themselves for it. Following the meeting, Monteleone told Miciotta "that this was an opportunity for all of us to elevate our stature in the family."

A truce organized by representatives of the other organized crime families of La Cosa Nostra broke down in November 1991 when members of the Orena faction attempted to kill Gregory Scarpa, Sr., a soldier in the Persico faction. Mazza testified that immediately after the attempted murder of Scarpa he went with Scarpa to see Anthony Russo, and after being informed of the attempt on Scarpa's life, Anthony Russo said that he would contact Sessa, Joseph Russo and others to let them know that "the shooting started." A meeting was then held at Joseph Russo's grandmother's house in Brooklyn, at which the Persico captains decided to retaliate. Ambrosino testified that Anthony Russo assured him that they were ready to attack the Orena side. He also testified that, sometime after this meeting, Joseph Russo and Theodore Persico told him [Ambrosino] that they, Anthony Russo, and others had attempted to kill Benny Aloi, an Orena captain, but had "just missed." According to Mazza and Sessa, Monteleone participated in a murder attempt on a different member of the Orena faction, Louis Malpeso, which was also unsuccessful.

During the early months of 1992, the Russos attended several meetings of Persico faction members to monitor the progress of the war. Sessa and Scarpa repeatedly complained that Scarpa and his crew were the only ones who had actually succeeded in killing any Orena faction members, and that they were unfairly shouldering the burden for all the others. The Russos provided assurances that their associates "were out every day looking for people," particularly those former members of the Russos' crew who had switched allegiances to the Orena side, including John Minerva. On March 25, 1992, John Minerva was killed outside a cafe he owned on Long Island. Michael Imbergamo, who apparently had been providing security for Minerva following an earlier attempt on Minerva's life two weeks prior to his murder, was killed along with Minerva. Eyewitness testimony and telephone records placed Monteleone, in an agitated state, ... at a bar and a delicatessen less than two blocks away from Minerva's cafe shortly before Minerva's murder.

Soon after the Minerva/Imbergamo murders, the Russos and other members of the Persico faction, including Scarpa, met at Wolf's Delicatessen in Manhattan. Mazza testified that during this meeting, the Russos admitted their involvement in these murders, bragging that "they had been working on getting [Minerva]" and "finally got to him in front of his cafe," and that they were particularly satisfied because Minerva had worked for Joseph Russo's father for many years before deciding to ally himself with Orena.

Unlike Mazza, Sessa testified that he first learned of the Russos' involvement in the murders not from the Russos themselves but from Scarpa. Soon after the murders, and after learning from Scarpa about the Russos' involvement, Sessa attended a meeting of Persico faction members (including Monteleone) at a New York diner. When he entered the meeting Sessa approached Joseph Russo and congratulated him for his "nice work," and Russo accepted the congratulations. Although Minerva's name was not mentioned, Sessa testified that he believed the reason for the congratulations—the killing of Minerva— was well understood by Russo. Sessa thereafter heard from another member of the Persico faction of the Colombo Family—either Joseph Tomasello or Theodore Persico—that Monteleone and another member of the Russos' crew, Tommy Gioeli, as well as a member of Theodore Persico's crew, had committed the Minerva/Imbergamo murders. Sessa, in turn, told Ambrosino that the Russos' crew was responsible for the murders.

The case presented by defendants-appell[ants][1] consisted largely of efforts to discredit the accomplice witnesses, and to portray the cycle of violence that erupted in 1991 as purely a personal vendetta on the part of Scarpa, perpetrated with the aid of Sessa. Defendants ... claimed that there was no factional war within the Colombo Family, but merely a "Scarpa/Sessa war." They argued that the attempted murder of Scarpa could be explained by the fact that Scarpa was widely believed to be a government informant, and that, in turn, Scarpa had purely personal motives for murdering his victims—to prevent them

from revealing that he was an informant and to retaliate against them for the attempt on Scarpa's life. More generally, defendants ... tried to portray Scarpa as "a loose cannon," and "argued to the jury that Scarpa was not a person to be trusted and was in fact an informant." Additionally, the Russos pointed to "the lack of hard evidence to link them to the Minerva and Imbergamo homicides," and challenged Mazza's testimony about the Russos' statements at the Wolf's Delicatessen meeting as uncorroborated and unreliable. *Id.* Monteleone, whose initial line of defense appeared to be that he could not be placed near the murder scene at the relevant time, ... argued in summation that although he was in fact present near the scene shortly before the murders, he had actually been secretly visiting Minerva, with whom he had remained friends despite the war.

### The Withheld Information

Shortly after trial, in response to a discovery request by defense attorneys in a different case, prosecutors for the first time disclosed that Scarpa was in fact a government informant, and had been so since at least 1980. Documents disclosed by the government (principally, internal FBI memoranda called "209s") revealed that Scarpa had provided substantial information to the government during his time as an informant, including information regarding the Orena/Persico war. Most significantly for purposes of this appeal, the 209s also revealed that, in discussions with the FBI, Scarpa had lied about or misrepresented his own involvement in several murders, which he either attributed to

---

**1.** We note that because the prior appeal was taken by the government, the current defendants-appellants were the appellees in this excerpt. We have altered the excerpt to refer to the Russos and Monteleone as "appellants" to be consistent with their current status.

the "Persico faction"—without identifying himself as the member of the faction responsible for the murders—or falsely attributed to someone else.[2]

Prosecutors also disclosed information—although, according to the district court, it was "produced more slowly"—regarding a potentially improper relationship that had developed between Scarpa and his FBI contact, Special Agent R. Lindley DeVecchio. It was ultimately revealed that, during Scarpa's years as an informant, DeVecchio may have given Scarpa highly sensitive information that would have helped Scarpa to wage war against the Orena faction and avoid arrest for his own criminal activities, as well as to avert the arrest of his associates and his son for their criminal acts. Suspicions within the FBI regarding this relationship had been strong enough, prior to the commencement of the trial in this case, to trigger an internal investigation. Prosecutors were aware both of Scarpa's informant status and of this internal FBI investigation prior to the beginning of the defendants' trial. In affidavits requested by the district court at the initial argument of the motions that [were] the subject of [the first] appeal, the prosecutors stated that they had not disclosed Scarpa's informant status or the investigation into alleged improprieties by DeVecchio because they believed that this information was not material under *Brady*. Prosecutors had also failed to turn over an FBI report—a so-called "302 report"—in which Mazza revealed his awareness that Scarpa had a law enforcement source whom Scarpa referred to as "the girlfriend" (the "Girlfriend 302"), despite the fact that the court had ordered the production of all Mazza 302s at the outset of trial. The Assistant United States Attorney responsible for the production of the Mazza 302s asserted in her affidavit that she was not aware of the "Girlfriend 302" because it was not turned over to her by the FBI agent from whom she had requested the Mazza 302s. The agent responsible for turning over these documents, in turn, attested that before doing so she consulted with her supervisor, who told her to put aside the two 302s relating to Scarpa's law-enforcement source (including the "Girlfriend 302"), which the supervisor believed should not be distributed outside of the FBI until the FBI had completed its internal investigation.

The District Court's Opinion

In response to these disclosures, the Russos and Monteleone, as well as co-defendants Theodore Persico, Sr. and Lawrence Fiorenza, filed post-trial motions for a new trial, ... and for dismissal of the indictment, ... Apart from arguing that the "outrageous government conduct" in this case warranted outright dismissal of the indictment, [the defendants] argued that a new trial was required because the withheld evidence about Scarpa could have been useful to the defense in a number of ways. The district court characterized the proposed theories regarding the usefulness of the Scarpa evidence as follows:

1) that it tends to cast doubt on the reliability of the government's investigation of their case; 2) that the testimony of Mazza and Sessa could have been impeached with the new information about their relationship with Scarpa; 3) that Scarpa's hearsay

---

2. Although the district court does not explain exactly how it is known that these murders were "indisputably committed" by Scarpa, the government does not challenge this assertion. [Footnote 2 in original].

statements could be impeached; 4) that the war in which defendants allegedly participated was in reality a "Scarpa/Sessa" war in which these two pursued their own agenda; 5) that Scarpa himself was pursuing his own agenda, creating the appearance of a factional war for his own purposes; and 6) that the government was the primary proponent of the war.

The district court denied the motions to dismiss the indictment, and denied the new-trial motions of co-defendants Theodore Persico, Sr. and Lawrence Fiorenza, but granted appell[ant]s' motions for a new trial on all counts except for the loansharking convictions. The court rejected all of appell[ant]s' theories as to why the Scarpa evidence required a new trial, with the exception of one—namely, that certain statements made by Scarpa to his FBI handler could have been used to impeach his out-of-court statements admitted at trial.[3] In particular, the court was concerned with "the Scarpa 209s in which Scarpa blames other members of the Persico faction for murders he indisputably committed." Although these 209s did not, in the court's view, require a new trial for Theodore Persico, Sr. and Lawrence Fiorenza, the court reached a different conclusion with respect to the Russos and Monteleone:

> The potential impact of these 209s on the jury's findings with respect to the Russos' and Monteleone's involvement in the murders resides in the government's reliance on co-conspirator statements explicitly attributed to Scarpa or which might have been

traced to Scarpa as its principal evidence of the Russos' involvement in these murders. Sessa was told of the Russos' culpability by Scarpa; he in turn told Ambrosino. The jury was informed of both of these Scarpa statements. Co-conspirator statements of other nonparticipants, Joseph Tomasello and Theodore Persico, also attributed the murders to the Russos and [Monteleone], but the source of that information was not explored and was arguably Scarpa.

Although the court recognized that "[a] substantial amount of evidence" of guilt existed independently of Scarpa's out-of-court statements, the court believed that sufficient doubt was cast upon the jury's verdict to require a new trial because "the fact that Scarpa lied to the FBI about some of his murderous activities gives rise to the inference that he lied about this one as well."

Having held that a new trial was required on the charges that appell[ant]s murdered Minerva and Imbergamo, the court believed it was compelled to grant a new trial as well on the charge of conspiracy to murder members of the Orena faction. While "[t]he independent and untainted evidence clearly demonstrates that the Russos were present at meetings having to do with the war and that Joseph Russo was appointed acting underboss of the family by Carmine Persico as the factions entrenched"—not to mention the clear evidence "link[ing] both Russos to plans to kill other Orena faction members"—the court concluded that "[w]ith doubt cast on [appellants']

---

3. Notably, in moving for a new trial appell[ant]s had given relatively little attention to this argument. Instead, they had relied primarily on the arguments that Scarpa's role as an informant precluded the admission of his out-of-court statements under the co-conspirator hearsay exception, and that the withheld evidence could have been used to show that there was no Orena/Persico war, but merely a personal war waged by Scarpa, with the help of Sessa and the FBI. [Footnote 3 in original].

involvement in the Minerva and Imbergamo homicides ... none of their other statements or acts makes a finding of guilt of conspiracy inescapable."

*United States v. Orena*, 145 F.3d 551, 553–57 (2d Cir.1998) (internal citations omitted). On the government's appeal from the grant of a new trial, we reversed and reinstated the convictions on the basis that the non-disclosure of Scarpa's informant status was not "material," and that the Form 209s did not place the jury verdict in doubt in light of other inculpatory evidence independent of Scarpa's statements. *See id.*, 145 F.3d at 560–61.

Following our decision, the appellants again moved in the district court for a new trial under Rule 33. This time the appellants based their motion on "new evidence" that did not come to their attention until after June 16, 1995, on which date the district court imposed a "cut-off" after which it would accept no further submissions supplementing their earlier motion.

This new evidence included the entire 550 page Office of Professional Responsibility file and the testimony of Special Agents of the Federal Bureau of Investigation concerning Agent DeVecchio's relationship with Scarpa. Of particular relevance to this appeal, appellants gained access for the first time to the Form 302 of the debriefing of Joseph Ambrosino on April 25, 1994. There Ambrosino disclosed that he believed a New York Post article that had been the subject of testimony by Sessa during the trial was referring to the possibility that Greg Scarpa, Sr. was a government informant. In addition, the appellants learned for the first time during habeas proceedings in a related case before Judge Weinstein in 1996 that Scarpa's informant status was "closed" and soon thereafter "reopened" by the FBI in early 1992, around the time Scarpa implicated the defendants in

the murders at issue here. On February 27, 1992, DeVecchio was ordered to "close" Scarpa as an informant. On that day, Imbriale (a member of the Persico faction) cooperated with law enforcement and reported Scarpa's involvement in the war and his plan to murder an Orena-faction member. The Minerva and Imbergamo murders occurred on March 25, 1992. On March 31, 1992, New York City police observed Scarpa throwing a loaded gun from a fleeing car, and Scarpa contacted DeVecchio to help him avoid arrest for gun possession. On that day, March 31, 1992, Scarpa told DeVecchio that "the hit on John Minerva was handled by Jo Jo and Chuckie Russo's people." On April 2, 1992, DeVecchio informed his supervisors that he was reopening Scarpa.

On March 18, 1999, the district court denied the second new trial motion without holding a hearing. With respect to appellants' allegations of perjury, the court found that a new trial was not warranted because the appellants had failed to demonstrate that either Mazza or Sessa had committed perjury. The court found in the alternative that even if there had been perjury, the appellants had failed to demonstrate that the government knew or should have known about it. With respect to the claims regarding admission of the "Scarpa hearsay," the district court held that the testimony was properly admitted because a government informant can still be a conspirator for purposes of Fed. R.Evid. 801(d)(2)(E). The district court declined to consider the appellants' claim of error with respect to their convictions under 18 U.S.C. § 924(c).

The appellants now appeal from the denial of their second Rule 33 motion and, because their convictions became final only after we reversed the earlier grant of a new trial, they appeal directly from their

convictions as well. The appellants argue that their judgments of conviction should be vacated and a new trial granted for five principal reasons: (1) there is newly discovered evidence that the cooperating witnesses Lawrence Mazza and Carmine Sessa perjured themselves at trial and that the government knew about the perjury; (2) the fact that Mazza and Sessa perjured themselves at trial now renders the Scarpa non-disclosures material within the meaning of *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (3) the district court erred in failing to instruct the jury that it had the power to determine whether Scarpa was in fact a co-conspirator under *United States v. DeSapio,* 435 F.2d 272, 282–83 (2d Cir.1970) (Friendly, *J.*); (4) Scarpa's statements were erroneously admitted under Fed.R.Evid. 801(d)(2)(E), because Scarpa was a government informant and therefore, as a matter of law, not a member of the conspiracy; and (5) *Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) requires us to vacate their firearms convictions under 18 U.S.C. § 924(c) because the district court improperly charged the jury on "use" of a weapon.

For the reasons set forth below, we reject these arguments, as well as other arguments that do not merit discussion, and affirm both the denial of a new trial and the judgments of conviction.

## DISCUSSION

*I. Mazza's and Sessa's Perjury*

 Appellants argue first that the district court abused its discretion in denying their motion for a new trial based on the newly discovered evidence that two principal witnesses, Mazza and Sessa, perjured themselves at trial and that the government knew about the perjury. We re-view the district court's decision not to grant a new trial based on newly discovered evidence for abuse of discretion. *See United States v. Wong,* 78 F.3d 73, 78 (2d Cir.1996). After carefully reviewing the appellants' claims, we agree with the government's contention that there was no perjury here and therefore the district court properly denied a new trial.

In the district court the appellants asserted four principal instances of perjury: (1) Mazza perjured himself when he stated that Joseph Russo gave him the first (incorrect) address of Miciotta, an Orena-faction target, and that an "Orena source" gave him the second, correct address; (2) Mazza perjured himself when he testified that he was not a fugitive; (3) Sessa committed perjury when he testified that he sold drugs for only two months and to only one customer; and (4) Sessa committed perjury when he testified that an article published by the New York Post referred to Gregory Scarpa, Jr., not Gregory Scarpa, Sr. The district court held that (1) neither Mazza nor Sessa committed perjury; (2) even if perjury did occur, the appellants did not demonstrate that the government knew or should have known about it; and finally, (3) there was ultimately, considering all the evidence, no demonstration that "but for the perjured testimony, the defendant would most likely not have been convicted." *United States v. Wallach,* 935 F.2d 445, 456–57 (2d Cir.1991). We agree entirely with the district court's analysis and dispositions with respect to the first three instances of purported perjury and therefore see no reason to discuss them further. We affirm those dispositions for substantially the reasons given by Judge Sifton in his Memorandum and Order of March 18, 1999. The appellants' fourth claim, however, merits further discussion.

The appellants maintain that Carmine Sessa perjured himself when he testified that there was "no truth" to the claim in an article published by the New York Post on Thanksgiving Day, 1991, that "Gregory Scarpa" was a government informant. They contend that Sessa committed perjury because either (1) he testified that the article was about Gregory Scarpa, Jr. (who was not an informant) and was lying because he knew the article referred to Scarpa, Sr. (who was an informant); or (2) he was referring to Scarpa, Sr. and therefore lying, because he knew Scarpa, Sr. was a government informant.

Judge Sifton had declined to grant a new trial on the same issue on the first Rule 33 motion because (1) the article was ambiguous since it did not explicitly state whether it referred to Scarpa Junior or Senior; and (2) he credited the affidavit of the Assistant United States Attorney that the questioning in context referred to Scarpa, Jr. On that initial motion, the appellants presented evidence, discovered after they were convicted, that in Sessa's testimony before Judge Korman in a related case, *United States v. Victor M. Orena*, Docket No. 93–CR–1366 (ERK), he stated that no one thought Scarpa, Jr. was an informant and that the article may have made a mistake between the father and the son.

On the second Rule 33 motion—the one we are now reviewing—the district court declined to reconsider its previous ruling because it found that the appellants did not offer any new evidence that could not, through the exercise of due diligence, have been presented in the first motion.

 In order to grant a new trial based on newly discovered evidence of trial perjury, the appellants must first demonstrate that the witness in fact committed perjury. *See United States v. Torres*, 128 F.3d 38, 49 (2d Cir.1997). A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory. *See United States v. Dunnigan*, 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury. *See United States v. Sanchez*, 969 F.2d 1409, 1414–15 (2d Cir.1992). Once this threshold demonstration of perjury has been met, however, a new trial is not foreordained:

> Whether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury. With respect to this latter inquiry, there are two discrete standards of review that are utilized. Where the prosecution knew or should have known of the perjury, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic. Where the government was unaware of a witness' perjury, however, a new trial is warranted only if the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.

*Wallach*, 935 F.2d at 457 (reversing convictions and remanding for new trial where government should have known that key witness lied on the stand) (internal citations and quotation marks omitted) (alteration in original).

The appellants argue correctly that, contrary to the district court's conclusion, they did offer new evidence-the Ambrosino

302—that was not available to them until after the June 16, 1995 cutoff date. The 302 reflects statements by Ambrosino that he believed the Post article referred to Scarpa Sr. and that he and Sessa believed that Scarpa Sr. "may be cooperating with law enforcement." However, it does not conclusively demonstrate anything about Sessa's beliefs at the time of his testimony at trial.

We are unpersuaded that the Ambrosino 302 evidence has the import the appellants ascribe to it: namely, that it demonstrates Sessa's perjury. We agree with the district court's initial determination that the Post article is ambiguous and, to a reasonable observer, could have referred to Scarpa Jr. Moreover, the appellants have not demonstrated any motive on Sessa's part to lie about Scarpa's status as an informant. In addition, the importance of the article and Sessa's testimony about it is strongly undercut by the fact that according to the Ambrosino 302, the New York Post printed a retraction approximately a week after the article was published. Finally, we agree with the district court that Sessa's testimony is so ambiguous as to preclude a finding of perjury. Sessa could simply have misspoken: while he seems to be referring to Greg Scarpa, Jr., he could have meant Gregory, Sr. On the other hand, he could have intentionally been referring to Scarpa, Jr. because he initially believed the article was about Junior, but later changed his mind after speaking with others about it. We also note that the appellants did nothing to clarify any of this confusion on cross-examination.

In the totality of the circumstances, there is an insufficient evidentiary basis for a finding of perjury. Thus, there is no reason for us to proceed further to determine whether any perjury "reasonably affected the jury's judgment." Were we to proceed further, however, we would have difficulty attaching any substantial significance to this claim, given the independent evidence supporting the appellants' convictions. See Wong, 78 F.3d at 82 (a new trial is warranted only where "the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted"). Even assuming perjury occurred here, it would not undermine the government's overall case given the fact that Sessa's testimony implicating the appellants was corroborated in material respects by (a) Mazza's testimony about the Wolf's Deli meeting at which the Russos accepted congratulations for the murders, and (b) independent evidence placing crew member Joseph Monteleone in an agitated state at the location of the murders at approximately the time they were committed.

## II. New Materiality

Because we find that the appellants have not shown that Mazza and Sessa committed perjury, we have no need to revisit the prior panel's conclusion that the Scarpa non-disclosures are not "material" under *Kyles* and *Brady*. See *Orena*, 145 F.3d at 557–60.

## III. Scarpa's Co Conspirator Status

The appellants raise two arguments related to Scarpa's status as a co-conspirator. First, they assert that because Scarpa was a government informant, he could not, as a matter of law, have been a co-conspirator, and thus his hearsay statements were improperly admitted under Federal Rule of Evidence 801(d)(2)(E). Second, they assert that the question of whether Scarpa was a co-conspirator should have been submitted to the jury and that the jury ought to have been given an instruction to that effect, as was given

in *United States v. DeSapio,* 435 F.2d 272, 282–83 (2d Cir.1970).

### A. Admission of Scarpa Statements

■ Appellants contend that Scarpa's statements were erroneously admitted as non-hearsay under Federal Rule of Evidence 801(d)(2)(E) because, at the time of his statements, Scarpa was operating as a government informant who sought to benefit himself by implicating others in crimes that he had committed. The district court, in its first Rule 33 decision, *United States v. Persico,* CR–92–0351, 1997 WL 867788, at *26 (E.D.N.Y. Mar.13, 1997), held that

the preponderance of the evidence indicates that Scarpa was engaged in this conspiracy as a bona fide co-conspirator, working with the defendants to depose Victor Orena. The evidence about Scarpa's involvement with the government suggests no more than that Scarpa's role as an informant was his frolic and detour; his principal endeavor was conspiring with the defendants.

We will not disturb a district court's findings on these factual issues unless they are clearly erroneous. Moreover, any improper admission of co-conspirator testimony is subject to harmless error analysis. *See United States v. Gigante,* 166 F.3d 75, 83 (2d Cir.1999), *cert. denied,* 528 U.S. 1114, 120 S.Ct. 931, 145 L.Ed.2d 811 (2000).

The Second Circuit has held that statements of a government informant may still be admissible as co-conspirator non-hearsay. *See DeSapio,* 435 F.2d at 282–83. In *DeSapio,* the defendants challenged the propriety of permitting a co-defendant to testify about statements made by Herbert Itkin, who had been working as an FBI informant for several years. We held that Itkin was still participating in the relevant conspiracy, "even though he was currently reporting developments to the FBI and doubtless did not expect to be prosecut-ed. . . . Itkin, on his own initiative, entered into an illicit agreement with [the defendants] to carry out" the illegal venture. *Id.* at 282.

The appellants rely on language from *United States v. Eisenberg,* 596 F.2d 522, 527 (2d Cir.1979), in which we noted, "If these people were, indeed, acting as Government informants throughout the alleged conspiracy, their declarations could not be admitted on a theory of agency." In *Eisenberg,* we held that the district court properly admitted the out-of-court statements of three co-conspirators as co-conspirator non-hearsay statements, because, despite the fact that

at times they acted as informants in other matters, [they] did not act as informers in the course of this conspiracy. They were not agents for the Government but were off on a frolic and detour for their own private profit. Indeed, defense counsel at trial recognized that [one of the three informants] was in fact an accomplice . . . [and that another informant] was indicted and convicted for participating in this very scheme and was sentenced to a term of imprisonment therefor.

*Id.* at 527. The appellants suggest that because Scarpa, unlike the three co-conspirators in *Eisenberg,* was acting as a government informant at the time of and during the course of this conspiracy, his statements were improperly admitted. We disagree.

■ Membership in a criminal conspiracy and rendering services to the government as an informant are not necessarily mutually exclusive roles. The status as a co-conspirator of one who is passing information to the government turns on whether his efforts as an agent of the government supplant his efforts as an agent of his co-conspirators. We draw a distinction between a co-conspirator who exchanges

information with the government while still pursuing the conspiracy's criminal objectives, and one whose conduct as a "co-conspirator" is shaped and directed by the desires of the government. Scarpa falls squarely into the former category.

As the district court noted, when "evidence of his criminal activities here came to light, [Scarpa] was investigated, arrested, indicted, and sentenced to spend essentially the remainder of his life in prison." *Persico,* 1997 WL 867788, at *26. Nowhere do the appellants allege that Scarpa was acting at the direction of the government, notwithstanding the fact that Agent DeVecchio supplied intelligence to Scarpa and became a partisan in the war, as exemplified by his exclamation: "We're going to win this thing" when DeVecchio heard that Scarpa had murdered Larry Lampesi.

Moreover, appellants' assertion that Scarpa was not a member of the conspiracy is wholly at odds with the position they took at trial. The defendants-appellants theorized at trial that Scarpa committed multiple acts of violence in this war and that he, not the appellants, was the prime proponent and leader of the war. *See Persico,* 1997 WL 867788, at *26.

We hold therefore that the Scarpa hearsay was properly admitted pursuant to Rule 801(d)(2)(E).

### B. Jury Instructions

■ Appellants also argue that they were entitled to the jury instruction given in *DeSapio* that the jury had the ultimate authority to determine whether Scarpa was a co-conspirator. An erroneous jury instruction requires a new trial unless the error is harmless. *See United States v. Masotto,* 73 F.3d 1233, 1239 (2d Cir.1996).

In *DeSapio,* the trial judge instructed the jury that if it found that "the FBI specifically instructed or authorized Itkin to participate in the Con Edison scheme from the very beginning, then [it] could determine that Itkin was not a conspirator as contemplated by the law." *DeSapio,* 435 F.2d at 283. The appellants contend that they should receive a new trial because no similar instruction was given here. They point out that they could not have requested such an instruction because only the FBI knew that Scarpa was an FBI informant and that his handler, Agent DeVecchio, was passing information to him.

■ Judge Friendly's opinion in *DeSapio* did not decide whether it is the province of the jury or the judge to determine ultimately whether an individual acted as a co-conspirator. *See id.* at 282. Although it cited with approval the instruction given, nothing in *DeSapio* required it. *See id.* at 282–83. Here, we similarly have no need to decide whether such an instruction is required, because even if the failure were error, it would be harmless for two reasons. First, there was overwhelming evidence that, whatever Scarpa's role as an informant exchanging intelligence with DeVecchio, Scarpa was at all times a fully participating member of the conspiracy alleged in the indictment. Second, there was ample independent evidence, untainted by the Scarpa hearsay, that connected the defendants both to the murders and to the conspiracy in this case. Therefore we hold that the appellants are not entitled to a new trial on the basis of a failure to give this instruction.

### IV. Jury Charge under 18 U.S.C. § 924(c)

With respect to their weapons convictions, appellants argue that the court improperly charged the jury on the legal standard under 18 U.S.C. § 924(c) because the charge did not make clear that "use"

requires "active employment" of a gun, as required by *Bailey v. United States*, 516 U.S. 137, 143–48, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), a case decided after the appellants were convicted. Because it had already declined to grant a new trial on the murder and murder conspiracy counts, the district court declined to address the argument presented below that if their murder and murder conspiracy convictions were vacated, appellants' convictions for firearms violations under § 924(c) must also be reversed.

Section 18 U.S.C. § 924(c) provides additional penalties for "any person who, during and in relation to any crime of violence ... uses or carries a firearm." The Supreme Court has interpreted "use" to require "active employment," which "includes brandishing, displaying, bartering, striking with, and, most obviously, firing or attempting to fire a firearm." *Bailey*, 516 U.S. at 148, 116 S.Ct. 501. The Court specifically excluded simple possession from the definition of "use": "the inert presence of a firearm, without more, is not enough to trigger § 924(c)(1)." *Bailey*, 516 U.S. at 149, 116 S.Ct. 501.

Although we normally review only for plain error when defendants fail to object at trial to a given instruction, here the government conceded that we review the district court's instruction under a modified plain error standard:

> When the source of plain error is a supervening decision, the defendant has not been derelict in failing to object at trial, and there is thus no cause to shift the burden of proving prejudice to the defendant. In this special context ... the government must show that the error did not affect the defendant's substantial rights.

*United States v. Viola*, 35 F.3d 37, 42 (2d Cir.1994). As noted above, an erroneous jury instruction requires a new trial unless the error is harmless. *See United States v. Masotto*, 73 F.3d 1233, 1239 (2d Cir. 1996).

To meet its burden of showing that the error was harmless, the government responds that while the instructions here neither explained that "use" means "active employment" nor distinguished between the meanings of "use" and "carry," they "stopped short of suggesting that mere possession was sufficient." We find that the government has met its burden here.

The court charged the jury that it must find as follows:

> First, that on any occasion on or about and between June 1991 and May 13, 1993, the defendant whose case you're considering carried or used a firearm;
>
> Second, that the defendant had knowledge that what he was using or carrying was a firearm; and
>
> Third, that the defendant carried or used the firearm during and in relation to a crime of violence with which he is charged in Counts One through Nine.

This charge did not authorize the jury to convict the appellants based on mere possession. Moreover, any error in the jury instruction was harmless because the government produced ample evidence that the appellants were seen carrying guns on several occasions. Joseph Russo was observed carrying a gun in his waistband while telling the members of his crew to prepare for the war. Monteleone was observed carrying a gun after the same meeting at Joseph Russo's house. Sessa testified that several times throughout the war he observed Anthony Russo and Monteleone carrying guns. After an attempt by the Orena faction to kill Scarpa, the Persico captains (including the Russos) met at Joseph Russo's grandmother's house to plan their retaliation and in the

course of the meeting, armed themselves with guns retrieved from a suitcase. *See United States v. Pimentel,* 83 F.3d 55, 59–60 (2d Cir.1996) (*Bailey* error harmless where the evidence showed carrying and the instruction adequately conveyed that a defendant could be found to have "transported," "conveyed," or "possess[ed]" the gun only if he had, *inter alia,* the "power ... to exercise control over" it); *cf. United States v. Vasquez,* 85 F.3d 59, 61 (2d Cir.1996) (noting that a pre-*Bailey* instructional error will be harmless where "the jury's finding of a section 924(c) violation was the 'functional equivalent' of a finding that the firearm had been unlawfully carried") (internal citations omitted). We therefore hold that any error was harmless.

*V. Remaining Arguments*

We have carefully considered appellants' remaining arguments that Anthony Russo's and Joseph Monteleone's trial attorneys rendered ineffective assistance of counsel; that there was insufficient evidence to support the convictions on each count; that there was prosecutorial misconduct; and that the indictment should be dismissed. We find these arguments to be wholly without merit.

**CONCLUSION**

For the foregoing reasons, the judgments of conviction, and the district court's denial of appellants' Rule 33 motion are hereby AFFIRMED.

Judge CALABRESI dissents in a separate opinion.

CALABRESI, J., dissenting:

I respectfully dissent.

At trial, defendants sought to persuade the jury that the violence inside the Colombo Family stemmed from a Scarpa Sessa war triggered by suspicions that Gregory Scarpa, Sr. was a government informant, rather than from the Persico/Orena factional battle charged by the government. Until after trial, the government admittedly suppressed evidence that Scarpa Sr., in fact, *was* an informant.[1] In the first appeal of these convictions, a panel of this court decided that, notwithstanding the government's improper behavior, a new trial was not the appropriate remedy. The panel held that the presence of strong independent evidence of guilt, and the availability of other evidence with which the defense could attack the government's case, rendered the government's misconduct insufficiently material to violate the constitution.[2] We are, of course, bound by that decision.

In these appeals, however, defendants argue that the government not only *suppressed* evidence directly supporting defendants' theory of the case, but, in addition, that, through its cooperating witnesses, the government actually *introduced* perjured testimony tending to un-

1. The suppressed evidence would have been helpful to the defense in other respects as well.

2. I note that the government, in its explanations of its conduct, might be construed to be saying that, because the suppression was not deemed to require a new trial, it did nothing wrong in the first place. It goes without saying that such behavior is not to be condoned even when it ultimately is deemed

harmless. As Attorney General John Ashcroft has recently observed, the government "has a more important duty than the prosecution of any single case," namely a "responsibility to promote the sanctity of the rule of law and justice ... [and] to protect the integrity of our system of justice." *See* David Johnston, *Citing F.B.I. Lapse, Ashcroft Delays McVeigh Execution,* N.Y. Times, May 12, 2001, at A1.

dermine defendants' theory. Thus, under direct examination, Sessa testified that he believed that a *New York Post* article claiming that "Gregory Scarpa" was a government informant referred to Scarpa, Jr., and was false. Given subsequent statements by Sessa and others that Sessa instead believed that the article referred to Scarpa, Sr. and that it was true, and given, moreover, that the government knew at trial (though it had suppressed this fact, *see Orena*, 145 F.3d at 556) that Scarpa, Sr. actually was cooperating with the FBI, it is plausible that Sessa was lying and that the government either was aware of Sessa's perjury, or closed its eyes to what was obvious. Furthermore, it was helpful to the government for Sessa to cast doubt on the relevance of the *Post* article, and, as a cooperating witness, Sessa was motivated to lie if he thought that doing so would please the government.

In pointing this out I do not mean to suggest that the testimony about the *Post* article can *only* be explained as showing perjury by Sessa, and as indicating that the government knew or should have known about the perjury. The government has put forward a number of arguments, both in its appellate briefs and in a sworn affidavit submitted to the district court, that would explain the testimony as the result of confusion. The problem, however, is that the district court denied defendants the opportunity to test the government's theories in an adversary hearing at which the critical issues of credibility and mental state could be explored. *See Forts v. Ward*, 566 F.2d 849, 851 (2d Cir. 1977) ("Normally, an evidentiary hearing is required to decide credibility issues."). Without such a hearing, I cannot rule on whether conscious lying took place.

If Sessa did perjure himself on the topic of Scarpa, Sr.'s cooperation, and the government knew or should have known of it, a new trial would, I think, be required, at least when one considers the cumulative effect of that perjury and the government's suppression of evidence concerning its relationship with Scarpa. It cannot be gainsaid that this trial would have looked radically different had the government permitted an accurate view of Scarpa's role to be put forward. Indeed, some, though not all, of the related cases that went to trial after Scarpa's role was revealed, resulted in acquittals.

I do not doubt that the evidence introduced at trial was sufficient to convict defendants on each count, even if we eliminate all of the evidence that is possibly traceable to Scarpa. But the fact that a jury *could* convict does not mean that it will. And defendants must have a fair opportunity to convince the jury that it should not do so. That opportunity, moreover, must be untainted by misguided government attempts to tilt the scales in its favor. Perhaps these defendants received a fair trial, and perhaps they did not. Because I cannot be confident of the answer on the current record, I dissent from the majority's decision to affirm these convictions. I would remand for an evidentiary hearing on whether Sessa perjured himself and, if he did, whether the government knew or should have known of it.